# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

JANE JONES,

               Plaintiff,

v.

DONALD TRUMP, in his official capacity as
President of the United States; JAMES R.
MCHENRY III, in his official capacity as
Acting Attorney General of the United States;
WILLIAM LOTHROP, in his official
capacity as Acting Director of the Federal
Bureau of Prisons,

               Defendants.

Civil Action No. 25-cv-00401-RCL

## MEMORANDUM OF LAW
## IN SUPPORT OF PLAINTIFF'S
## EMERGENCY MOTION FOR A
## TEMPORARY RESTRAINING ORDER
## AND PRELIMINARY INJUNCTION

Jennifer L. Levi**
Bennett H. Klein*
Sarah Austin*
**GLBTQ LEGAL ADVOCATES
& DEFENDERS**
18 Tremont, Suite 950
Boston, MA 02108

Christopher F. Stoll*
Amy Whelan*
**NATIONAL CENTER FOR
LESBIAN RIGHTS**
870 Market Street, Suite 370
San Francisco, CA 94102

Jennifer Fiorica Delgado (Bar. No. NY296)
Alexander Shalom **
Natalie J. Kraner **
Wayne Fang*
Markiana J. Julceus*
**LOWENSTEIN SANDLER LLP**
1251 Avenue of the Americas
New York, NY 10020

*Pro Bono Counsel for Plaintiffs*
*\* Pro Hac Vice Pending*
*\*\* Admission Forthcoming*

# <u>TABLE OF CONTENTS</u>

**Page**

TABLE OF AUTHORITIES ...................................................................................................III

INTRODUCTION ...................................................................................................................1

STATEMENT OF FACTS .......................................................................................................2

I.     JANE JONES HAS CONSISTENTLY RESIDED IN WOMEN'S FACILITIES
       SINCE HER INCARCERATION IN BOP. .................................................................2

II.    JANE JONES AND HER MEDICAL CARE. ..............................................................3

III.   DAYS AFTER PRESIDENT TRUMP'S ISSUANCE OF EXECUTIVE ORDER
       14168, JANE JONES WAS MOVED FROM GENERAL POPULATION IN A
       WOMEN'S FACILITY TO A MEN'S PRISON. ..........................................................3

IV.    JANE JONES FACES SERIOUS RISK OF VIOLENCE AND IRREVERSIBLE
       PHYSICAL CHANGES DUE TO HER TRANSFER TO A MEN'S FACILITY. ...........5

LEGAL STANDARD...............................................................................................................6

ARGUMENT ...........................................................................................................................7

I.     PLAINTIFF IS LIKELY TO SUCCED ON THE MERITS. ...........................................7

       A.     Jane Jones is Likely to Succeed Under Count One of Her Complaint
              Because Sections 4(a) and 4(c) Violate the Fifth Amendment's Equal
              Protection Guarantee..........................................................................................7

              1.     Section 4(a)'s Sex-Based Classification Triggers Heightened
                     Scrutiny. ..................................................................................................8

              2.     Section 4(a) Fails Heightened Scrutiny. ..................................................10

              3.     Section 4(c)'s Categorical Ban on Medical Care Triggers
                     Heightened Scrutiny...............................................................................12

              4.     Section 4(c) Fails Heightened Scrutiny. ..................................................12

              5.     Sections 4(a) and 4(c) Fail Even Rational Basis Review Because
                     They Are Based on Animus Toward Transgender People.........................13

       B.     Ms. Jones Has a Substantial Likelihood of Success on the Merits of Her
              Eighth Amendment Claims...............................................................................14

1.     The Executive Order Mandates Deliberate Indifference to Ms. Jones's Serious Medical Needs Through Its Blanket Ban on Gender Dysphoria Treatment. ................................................................14

2.     The Executive Order Subjects Ms. Jones to Cruel and Unusual Punishment by Failing to Protect Her From a Serious Risk of Bodily Harm. ................................................................16

C.     Plaintiff Has a Substantial Likelihood of Success on the Merits of Her Administrative Procedure Act Claim. ................................................................18

II.     MS. JONES WILL SUFFER IRREPARABLE HARM ABSENT THIS COURT'S INTERVENTION. ................................................................20

A.     Ms. Jones Faces Irreparable Harm by Being Subjected to an Extremely High Risk of Violence and Sexual Abuse. ................................................................21

B.     Ms. Jones Faces Irreparable Harm by Being Denied Essential Medical Care. ................................................................22

C.     Deprivation of Constitutional Rights Also Constitutes Irreparable Harm. ............23

III.     THE BALANCE OF HARMS AND PUBLIC INTEREST WEIGH HEAVILY IN FAVOR OF EMERGENCY RELIEF. ................................................................24

CONCLUSION ................................................................25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**CASES**

*Abbot Lab'ys. v. Gardner*,
   387 U.S. 136 (1967)..................................................................................................17

*Adams v. Fed. Bureau of Prisons*,
   716 F. Supp. 2d 107 (D. Mass. 2010) .......................................................................21

*Adkins v. City of N.Y.*,
   143 F. Supp. 3d 134 (S.D.N.Y. 2015)..........................................................................8

*Barrett v. Coplan*,
   292 F. Supp. 2d 281 (D.N.H. 2003) ...........................................................................21

*Battista v. Clarke*,
   645 F.3d 449 (1st Cir. 2011) ......................................................................................21

*Bd. of Educ. of the Highland Loc. Sch. Dist. v. U.S. Dep't of Educ.*,
   208 F. Supp. 3d 850 (S.D. Ohio 2016) .........................................................................8

*Becker v. Sherman*,
   No. 16-cv-0828, 2017 WL 6316836 (E.D. Cal. Dec. 11, 2017)
   ...................................................................................................................................20

*Bennett v. Spear*,
   520 U.S. 154 (1997)....................................................................................................16

*Bostock v. Clayton County*,
   590 U.S. 644, 140 S. Ct. 1731 (2020)...........................................................................7

*Calderon-Ortiz v. LaBoy-Alvarado*,
   300 F.3d 60 (1st Cir. 2002).........................................................................................15

*City of Cleburne v. Cleburne Living Center*,
   473 U.S. 432 (1985)................................................................................................7, 12

*Cordellioné v. Comm'r*,
   No. 3:23-cv-00135, 2024 U.S. Dist. LEXIS 173316 (S.D. Ind. Sep. 17, 2024).....................12

*Cuoco v. Moritsugu*,
   222 F.3d 99 (2d Cir. 2000)..........................................................................................14

*De'Lonta v. Angelone*,
   330 F.3d 630 (4th Cir. 2003) ......................................................................................14

*Dep't of Com. v. New York*,
   588 U.S. 752 (2019)..................................................................................................18

*Doe v. District of Columbia*,
   215 F. Supp. 3d 62 (D.D.C. 2016) ..........................................................................16

*Doe v. Mass. Dep't of Corr.*,
   No. 17-12255, 2018 U.S. Dist. LEXIS 99925 (D. Mass. June 14, 2018)
   ...................................................................................................................................10

*Edmo v. Corizon, Inc.*,
   935 F.3d 757 (9th Cir. 2019) ...................................................................................14

*Estelle v. Gamble*,
   429 U.S. 97 (1976)....................................................................................................13

*F.V. v. Barron*,
   286 F. Supp. 3d 1131 (D. Idaho 2018) ......................................................................8

*Farmer v. Brennan*,
   511 U.S. 825 (1994)............................................................................................15, 16

*Fields v. Smith*,
   653 F.3d 550 (7th Cir. 2011) .............................................................................14, 15

*Fields v. Smith*,
   712 F. Supp. 2d 830 (E.D. Wis. 2010)...............................................................11, 12

*Flack v. Wis. Dep't of Health Servs.*,
   328 F. Supp. 3d 931 (W.D. Wis. 2018) ......................................................................9

*Fowler v. Stitt*,
   104 F.4th 770 (10th Cir. 2024) ..................................................................................8

*Franklin v. Massachusetts*,
   505 U.S. 788 (1992)..................................................................................................17

*Frontiero v. Richardson*,
   411 U.S. 677 (1973)....................................................................................................7

*Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Loc. No. 70 of Alameda Cnty.*,
   415 U.S. 423 (1974)....................................................................................................5

*Greene v. Bowles*,
   361 F.3d 290 (6th Cir. 2004) ...................................................................................20

*Grimm v. Gloucester Cnty. Sch. Bd.*,
  972 F.3d 586 (4th Cir. 2020) ........................................................................8

*Hampton v. Baldwin*,
  No. 3:18-CV-550, 2018 U.S. Dist. LEXIS 190682 (S.D. Ill. Nov. 7, 2018) ....................10, 20

*Hawaii v. Trump*,
  878 F.3d 662 (9th Cir. 2017) ........................................................................17

*Hecox v. Little*,
  79 F.4th 1009 (9th Cir. 2023) ........................................................................8

*Hicklin v. Precynthe*,
  No. 4:16-CV-01357, 2018 WL 806764 (E.D. Mo. Feb. 9, 2018)........................................14

*Int'l Refugee Assistance Project v. Trump*,
  373 F. Supp. 3d 650 (D. Md. 2019) ..................................................................17

*Kadel v. Folwell*,
  100 F.4th 122 (4th Cir. 2024) ........................................................................8

*Karnoski v. Trump*,
  926 F.3d 1180 (9th Cir. 2019) ........................................................................8

*Keohane v. Fla. Dep't of Corr. Sec'y*,
  952 F.3d 1257 (11th Cir. 2020) ......................................................................14

*Lemoyne-Owen College v. NLRB*,
  357 F.3d 55 (D.C. Cir. 2004) ........................................................................18

*Lojan v. Crumbsie*,
  No. 12-CV-0320, 2013 WL 411356 (S.D.N.Y. Feb. 1, 2013)........................................16, 21

*Lyng v. Castillo*,
  477 U.S. 635 (1986)..................................................................................7

*M.A.B. v. Bd. of Educ. of Talbot Cty.*,
  286 F. Supp. 3d 704 (D. Md. 2018) ..................................................................8

*MH v. Adams*,
  No. 1:22-cv-00409, 2024 WL 3237006 (D. Idaho June 29, 2024)........................................22

*Monroe v. Baldwin*,
  424 F. Supp. 3d 526 (S.D. Ill. 2019)................................................................21

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983)................................................................................17, 18

*Norsworthy v. Beard*,
  87 F. Supp. 3d 1104 (N.D. Cal. 2015) ................................................................8

*Romer v. Evans*,
  517 U.S. 620 (1996).........................................................................9, 11, 12

*Smith v. City of Salem*,
  378 F.3d 566 (6th Cir. 2004) ...........................................................................8

*Soneeya v. Spencer*,
  851 F. Supp. 2d 228 (D. Mass. 2012) .............................................................14

*Sosa v. Mass. Dep't of Corr.*,
  80 F.4th 15 (1st Cir. 2023)..............................................................................13

*Stone v. Trump*,
  400 F. Supp. 3d 317 (D. Md. 2019) .................................................................8

*Stover v. Corr. Corp. of Am.*,
  No. 1:12-cv-00393, 2015 WL 874288 (D. Idaho Feb. 27, 2015) ...........................16

*Tay v. Dennison*,
  457 F. Supp. 3d 657 (S.D. Ill. 2020)...........................................................10, 20

*Toomey v. Arizona*,
  No. CV-19-00035, 2019 WL 7172144 (D. Ariz. Dec. 23, 2019) ...........................8

*U.S. Dep't of Agric. v. Moreno*,
  413 U.S. 528 (1973)......................................................................................7, 12

*United States v. Virginia (VMI)*,
  518 U.S. 515 (1996)......................................................................................6, 10

*United States v. Windsor*,
  570 U.S. 744 (2013)...........................................................................................6

*Whitaker v. Kenosha Unified Sch. Dist.*,
  858 F.3d 1034 (7th Cir. 2017) .........................................................................8

*Zollicoffer v. Livingston*,
  169 F. Supp. 3d 687 .....................................................................................9, 16

**STATUTES**

5 U.S.C. § 704...................................................................................................16

Administrative Procedure Act.........................................................................1, 18

REGULATIONS

28 C.F.R. § 115.4 ............................................................................................................16

28 C.F.R. § 115.41 ..........................................................................................................15

28 C.F.R. § 115.42(c) ......................................................................................................18

OTHER AUTHORITIES

Fifth Amendment ...............................................................................................................2

Eighth Amendment ..........................................................................................1, 2, 13, 15

Equal Protection Clause ...............................................................................................7, 12

U.S. Dep't of Justice Off. of Justice Programs, *Sexual Victimization in Prisons and Jails Reported by Inmates, 2011-12* (2014), https://www.ojp.gov/library/publications/sexual-victimization-prisons-and-jails-reported-inmates-2011-12 ...............................................4

U.S. DOJ, *Transgender Offender Manual §§ 5–6* (2022), available at https://www.bop.gov/policy/progstat/5200-08-cn-1.pdf ......................................................10

## **INTRODUCTION**

In the late hours of Friday, ████████████, Plaintiff Jane Jones, an incarcerated transgender woman, was transferred from a low-security, all-women's ████ to the Segregated Housing Unit ("SHU") of a men's medium-security facility operated by the Bureau of Prisons ("BOP"). Ms. Jones has been in BOP custody since ████████ and, until this abrupt transfer, was consistently housed in women's units throughout her time in custody. Despite the BOP having recognized her as a woman during her incarceration, she was suddenly transferred to a men's facility. On ██████████████, Jane Jones was transferred back to the all-women's ████ but she can at any moment be transferred again to a men's prison.

The sole reason for the ████████████, transfer was Ms. Jones's status as a transgender woman, pursuant to President Trump's issuance of Executive Order 14168, titled "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government" on January 20, 2025 ("the Order"). Based on the Order, the BOP transferred Ms. Jones. At all times, Ms. Jones's sex classification on publicly accessible BOP records has remained "female," yet she was, for three days, housed in a male facility and can be transferred there again. Ms. Jones fears both for her safety if she is transferred back to a men's prison and for her health upon the termination of the medications she has taken for nearly ██ years to treat her gender dysphoria. Without hormone therapy, her body will undergo significant changes that will put her at risk of physical harms and exacerbate her gender dysphoria, causing the kind of disabling depression, anxiety, lack of self-esteem, and suicidality that characterize untreated gender dysphoria. She will lose the benefits of the medications she has taken since ████, causing her severe and irreparable physical and psychological harm.

Ms. Jones seeks emergency relief to enjoin Sections 4(a) and 4(c) of the Order, which change BOP's housing and medical care policies, as violations of equal protection, the Eighth

Amendment, and the Administrative Procedure Act. The Order discriminates against transgender people without constitutional justification. As a result of the Order, Ms. Jones has been—and may at any moment be—exposed to an ongoing risk of sexual assault in a men's prison and severe physical and psychological harm caused by terminating her hormone therapy. Emergency relief is thus needed to ensure the status quo remains by preventing Ms. Jones from again being transferred to a men's facility and maintaining her medication access while this case proceeds under the Fifth Amendment, Eighth Amendment, Rehabilitation Act, and Administrative Procedure Act.

Ms. Jones's claims are substantially the same as those raised in the related case, *Doe v. McHenry* ("*Doe*"), No. 25-cv-286, and the Court should grant the same relief as it did there.

## STATEMENT OF FACTS

### I.    JANE JONES HAS CONSISTENTLY RESIDED IN WOMEN'S FACILITIES SINCE HER INCARCERATION IN BOP.

Since her initial incarceration in ███████, and up until ████████, Ms. Jones was housed only with women. (Decl. of Jane Jones ("Jones Decl.") ¶¶ 10, 11.)

From ██████ until ████████, Ms. Jones was housed in the women's ███████ ████████████████████████. (*Id.* ¶ 10.) She has no disciplinary history and was housed in general population, where she presented no threat to other female peers. (*Id.* ¶ 13.) Ms. Jones is enthusiastically involved with a program in which she ███████████████████████ ██. (*Id.* ¶ 12.) And because ███████████ is a women's facility, Ms. Jones had access to all necessary female-related items through the commissary. (*Id.* ¶ 10.) She also received hormone medications necessary to ensure her health and safety and was permitted to ██████████ ████████████████████. (*Id.* ¶ 9.)

-2-

## II.    JANE JONES AND HER MEDICAL CARE

Ms. Jones is a ▮▮▮▮▮ transgender woman diagnosed with gender dysphoria at approximately ▮▮▮. (*Id.* ¶¶ 2, 4.) She has maintained the medically necessary treatment for her gender dysphoria for ▮▮▮▮ years. (*Id.* ¶ 4.)

Gender dysphoria is a serious medical condition that requires treatment through gender transition, including hormone therapy in appropriate cases. (Decl. of Lauren Meade, M.D. ("Meade Decl.") ¶¶ 2–3.) This treatment protocol is endorsed by major medical associations, including the American Medical Association, American Psychiatric Association, American Psychological Association, and Endocrine Society, which recognize it as the only effective treatment for gender dysphoria. (*Id.*) In addition, because Ms. Jones has received a vaginoplasty and therefore does not produce endogenous hormones, stopping her medications will put her at risk for loss of bone density and other physical harms. (*Id.* ¶¶ 6–7.) Medical professionals warn that termination of hormone therapy can cause permanent physical and emotional harm, self-mutilation, and suicidality. (Meade Decl. ¶¶ 7–9.) Forcing Ms. Jones to stop hormone therapy would trigger severe physical and psychological consequences.

## III.    DAYS AFTER PRESIDENT TRUMP'S ISSUANCE OF EXECUTIVE ORDER 14166, JANE JONES WAS MOVED FROM GENERAL POPULATION IN A WOMEN'S FACILITY TO A MEN'S PRISON.

On January 20, 2025, President Trump issued Executive Order 14166. In relevant part, the Order: (1) categorically bars transgender women from women's prisons, mandating their transfer to men's facilities regardless of individual safety considerations; and (2) categorically prohibits BOP from providing "any medical procedure, treatment, or drug for the purpose of conforming an inmate's appearance to that of the opposite sex." (EO 14168 ¶ 4(c).)

On ▮▮▮▮▮▮, as a result of the Order's issuance, BOP moved Ms. Jones to ▮▮▮ ▮▮▮▮—a men's medium security facility. (Jones Decl. ¶ 14.) Upon arrival, Ms. Jones was

-3-

placed in the SHU, where Ms. Jones was held alone in solitary confinement in a small cell with no access to activities. (*Id*. ¶ 16.) Her communication with outside family members was also severely restricted. (*Id*.) She was also subjected to 24/7 surveillance by male guards, including while she used the restroom.  (*Id*. ¶ 17.)

On ████████████, a high-ranking prison official informed Ms. Jones that she would soon be transferred to another men's prison and released to the general population. (*Id*. ¶ 22.) Because Ms. Jones understood that her transfer to the men's prison was due to the President's executive order, she ███████████████████████████████████████████ ██████. (*Id*. ¶ 21.)

On ████████████, Jane Jones was transferred back to the women's ████. (*Id*.) On February 10, 2025, Ms. Jones filed a Complaint challenging Sections 4(a) and 4(c) of the Executive Order.  Ms. Jones did not file a motion seeking emergency relief at that time because the temporary restraining order issued by this Court in *Doe* (the "*Doe* TRO") prevented Defendants from "implementing Sections 4(a) and 4(c) of Executive Order 14168."  Thus, Plaintiff and all other transgender women in BOP custody subject to the Executive Order were protected from transfer and potential cessation of medical treatment by the *Doe* TRO. On February 18, 2025, this Court entered an order granting plaintiffs' motion for a Preliminary Injunction in *Doe* (the "*Doe* PI"). The Order is substantially similar to the *Doe* TRO, except that the prohibition against implementing Sections 4(a) and 4(c) is now limited to the plaintiffs in *Doe*.  Therefore, while Plaintiffs in *Doe* remain protected from transfer or cessation of medical care, Ms. Jones no longer has such protections.[1]

---

[1] Plaintiff files this Motion based on a cautionary interpretation of the *Doe* PI as being narrower than the relief initially afforded under the *Doe* TRO, which all parties had interpreted as preventing

Ms. Jones is terrified that she could be transferred to an all-male facility and be housed there as a female inmate amongst an all-male population, as she was once before, and now makes this motion. (Jones Decl. ¶ 24.)

## IV. JANE JONES FACES SERIOUS RISK OF VIOLENCE AND IRREVERSIBLE PHYSICAL CHANGES IF SHE IS ONCE AGAIN TRANSFERRED TO A MEN'S FACILITY.

By transferring Ms. Jones to a men's facility and terminating her hormone therapy, the BOP will place her in immediate physical and psychological danger.

Courts, researchers, and corrections professionals recognize that transgender women housed in men's prisons face extremely high levels of violence and sexual assault, as well as pervasive sexual harassment. This reality is uncontroverted. A 2013 study by the Department of Justice estimated that nearly 35% of transgender inmates in state and federal prisons were sexually assaulted between 2007 and 2012. U.S. Dep't of Justice Off. of Justice Programs, *Sexual Victimization in Prisons and Jails Reported by Inmates, 2011–12*, NCJ No. 241399, Supplemental Table 1 (2013).[2] From 2011 to 2012, transgender people were sexually assaulted at nearly ten times the rate for the general incarcerated population.[3]

Consistent with this evidence, Ms. Jones would face an extremely high risk of victimization and sexual violence in a men's prison. (Jones Decl. ¶ 26.) If released into the general population of the men's prison, she may be subjected to humiliating and dangerous circumstances, such as

---

the Defendants from implementing Sections 4(a) and 4(c) against any transgender woman in BOP custody given the irreparable harms implementation would cause. If the Court intended the *Doe* PI to have the same scope as the *Doe* TRO and to encompass Plaintiff and others who would otherwise be subject to the Executive Order, then this motion is unnecessary and Plaintiff respectfully requests that the *Doe* PI be clarified to reflect that intent.

[2] Available at https://bjs.ojp.gov/content/pub/pdf/svpjri1112_st.pdf.

[3] *Compare id.* (noting a 39.9% sexual victimization rate for transgender people from 2011 to 2012), *with* the full report at 6 (reflecting a 4.0% rate of sexual victimization in the general prison population from 2011 to 2012), available at https://bjs.ojp.gov/content/pub/pdf/svpjri1112.pdf.

being forced to be unclothed and shower among male prisoners, leaving her female body, including her breasts and genitals, exposed and vulnerable to sexual violence. (*See id.*) The Order's termination of gender dysphoria treatment will cause psychological distress and irreversible physical changes. Being forced to use men's clothing, male pronouns, and to live in an environment where she is treated as male after nearly ███ years of transitioning to female—would worsen her gender dysphoria and contradict her medical plan. (*Id.* ¶¶ 14, 16-17, 20, 22, 24, 26-28.)

## **LEGAL STANDARD**

In order to obtain a preliminary injunction, a moving party must "make a 'clear showing' that (1) it has a likelihood of success on the merits, (2) the balance of equities favors preliminary relief, (3) an injunction is in the public interest, and (4) it will likely suffer irreparable harm before the district court can resolve the merits of the case." *Singh v. Berger*, 56 F.4th 88, 95 (D.C. Cir. 2022); *see also Archdiocese of Washington v. Washington Metro. Area Transit Auth.*, 897 F.3d 314, 321 (D.C. Cir. 2018) (stating preliminary injunction standard); *Chef Time 1520 LLC v. Small Bus. Admin.*, 646 F. Supp. 3d 101, 109 (D.D.C. 2022) ("The decision of whether to award a TRO is 'analyzed using the same "factors applicable to preliminary injunctive relief"'" (quoting *Banks v. Booth*, 459 F. Supp. 3d 143, 149 (D.D.C. 2020)). All four factors overwhelmingly support granting temporary restraints and a preliminary injunction in this matter.

The purpose of preliminary relief is to preserve the status quo pending the resolution of the underlying litigation. *Dist. 50, United Mine Workers of Am. v. Int'l Union, United Mine Workers of Am.*, 412 F.2d 165, 168 (D.C. Cir. 1969); *Abdullah v. Bush*, 945 F. Supp. 2d 64, 67 (D.D.C. 2013). The same is true of temporary restraining orders. *Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Loc. No. 70 of Alameda Cnty.*, 415 U.S. 423, 439 (1974) (TRO's "are no doubt necessary in certain circumstances," to "serv[e] their underlying purpose of preserving the status quo and preventing irreparable harm."). The relevant status quo is the position

-6-

of the parties not at the start of the litigation, but rather, at the "last uncontested status which preceded the pending controversy." *Dist. 50, United Mine Workers of Am.*, 412 F.2d at 168; *Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 733 (D.C. Cir. 2022) (finding that "status quo" was "last regime in place" before imposition of the government agency's order from which plaintiff sought injunctive relief).

Here, the last uncontested status quo is that which existed prior to the President issuing the Executive Order on January 20, 2025.

## ARGUMENT

## I.     PLAINTIFF IS LIKELY TO SUCCED ON THE MERITS.

### A.     Jane Jones is Likely to Succeed Under Count One of Her Complaint Because Sections 4(a) and 4(c) Violate the Fifth Amendment's Equal Protection Guarantee.

"The liberty protected by the Fifth Amendment's Due Process Clause contains within it the prohibition against denying to any person the equal protection of the laws." *United States v. Windsor*, 570 U.S. 744, 774 (2013). "The approach to Fifth Amendment equal protection claims is 'precisely the same' as the approach to Fourteenth Amendment equal protection claims." *Azam v. D.C. Taxicab Comm'n*, 46 F. Supp. 3d 38, 49 (D.D.C. 2014) (quoting *Weinberger v. Wiesenfeld*, 420 U.S. 636, 638 n.2 (1975)).

Sex-based laws trigger heightened scrutiny, requiring the government to show "at least that the [challenged] classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives." *United States v. Virginia (VMI)*, 518 U.S. 515, 533 (1996) (quotations omitted) (modifications in original). The justification must be "exceedingly persuasive" and "genuine," not "hypothesized" or "invented *post hoc* in response to litigation," and it "must not rely on overbroad generalizations

about the different talents, capacities, or preferences of males and females." *Id*. The "burden of justification is demanding, and it rests entirely on the [government]." *Id*.

Laws that discriminate on other quasi-suspect bases are also subject to heightened scrutiny. When determining whether a particular group qualifies as a quasi-suspect class, courts consider: (1) whether the group has historically faced discrimination; (2) whether the group exhibits an obvious, immutable, or distinguishing characteristic that defines them as a discrete group; (3) whether those characteristics relate to the group's ability to perform or contribute to society; and (4) whether the group is a minority or politically powerless. *See generally Frontiero v. Richardson*, 411 U.S. 677, 684–87 (1973); *Lyng v. Castillo*, 477 U.S. 635, 638 (1986).

In addition, the Supreme Court has long held that laws violate the requirement of equal protection when based on "a bare desire to harm a politically unpopular group," *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973), or "mere negative attitudes" and "fear," *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 448 (1985). Here, in addition to failing heightened scrutiny, Sections 4(a) and 4(c) fail even this basic test. As the record demonstrates, these measures are so sweeping, cause such severe harms, and are so disconnected from any asserted justification that they are inexplicable by anything other than animus toward transgender people.

### 1. Section 4(a)'s Sex-Based Classification Triggers Heightened Scrutiny.

Section 4(a) creates an explicit sex-based classification by mandating that the BOP assign housing based solely on birth sex and by categorically prohibiting transgender women from being housed in women's facilities. This classification triggers heightened scrutiny in two independent ways. First, Section 4(a) discriminates based on sex on its face by using birth sex as the sole criterion for housing assignments. Second, by targeting transgender people for different treatment, it necessarily creates a sex-based classification, because "it is impossible to discriminate against a

person for being homosexual or transgender without discriminating against that individual based on sex." *Bostock v. Clayton Cnty.*, 590 U.S. 644, 660 (2020). This District has previously concluded that transgender classifications are sex-based classifications, which require heightened scrutiny under the Equal Protection Clause. *Doe 1 v. Trump*, 275 F. Supp. 3d 167, 209 (D.D.C. 2017), *vacated on other grounds sub nom. Doe 2 v. Shanahan*, 755 F. App'x 19 (D.C. Cir. 2019); *see also Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Hum. Servs.,* 485 F. Supp. 3d 1, 39–40 (D.D.C. 2020) (holding that "[t]here is no apparent reason why [*Bostock*'s] conclusion— that it is 'impossible' to discriminate based on transgender status without discriminating based on sex, *see* 140 S. Ct. at 1741—would remain cabined to Title VII"). Multiple circuit courts concur. *See Fowler v. Stitt*, 104 F.4th 770, 793 (10th Cir. 2024); *Kadel v. Folwell*, 100 F.4th 122, 153 (4th Cir. 2024) (en banc); *Hecox v. Little*, 79 F.4th 1009, 1026 (9th Cir. 2023); *Whitaker v. Kenosha Unified Sch. Dist.*, 858 F.3d 1034, 1051 (7th Cir. 2017).

Additionally, transgender people constitute a quasi-suspect class because they meet all four criteria established by the Supreme Court. *See Doe 1,* 275 F. Supp. 3d at 208–09. Transgender people have suffered pervasive discrimination throughout history, including laws and policies that: (i) criminalized their ability to dress and appear as who they are; (ii) banned them from federal employment and military service; (iii) excluded them from marriage; (iv) terminated their parental rights; and (v) restricted their ability to obtain healthcare. Transgender people share the immutable and distinguishing characteristic of having a sex different than the sex assigned to them at birth. While this characteristic bears no relation to their ability to contribute to society, transgender people have been unable to secure basic rights through the political process. For all these reasons, federal courts throughout the country have held that transgender-status discrimination triggers

heightened scrutiny.[4] As one district court put it, courts "would be hard-pressed to identify a class of people more discriminated against historically or otherwise more deserving of the application of heightened scrutiny when singled out for adverse treatment, than transgender people." *Flack v. Wis. Dep't of Health Servs.*, 328 F. Supp. 3d 931, 953 (W.D. Wis. 2018).

That Section 4(a) classifies based on sex and transgender status does not resolve the inquiry; rather, it establishes that heightened scrutiny applies. Under this standard, the burden shifts to the government to demonstrate an exceedingly persuasive justification for the classification, showing that it serves important governmental objectives and is substantially related to achieving those objectives. The government cannot meet that burden here.

### 2.    Section 4(a) Fails Heightened Scrutiny.

Under heightened scrutiny, Section 4(a) fails because it serves no important or even legitimate governmental purpose. Rather than advancing a legitimate penological interest, Section 4(a)'s categorical rule puts transgender women at severe risk of harm and prevents prison officials from exercising their discretion to make housing placements based on individualized safety and security considerations. The provision undermines rather than advances safety.

Section 4(a) creates severe, documented risks of physical and sexual assault against transgender women by forcing them into men's facilities with no consideration of individualized circumstances, their individual safety and security, or the impact on the overall safety and security

---

[4] *See Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 610–11 (4th Cir. 2020) (collecting authorities); *Karnoski v. Trump*, 926 F.3d 1180, 1192, 1200–01 (9th Cir. 2019); *Smith v. City of Salem*, 378 F.3d 566, 572 (6th Cir. 2004); *Toomey v. Arizona*, No. CV-19-00035, 2019 WL 7172144, at *5 (D. Ariz. Dec. 23, 2019); *Stone v. Trump*, 400 F. Supp. 3d 317, 355 (D. Md. 2019); *F.V. v. Barron*, 286 F. Supp. 3d 1131, 1145 (D. Idaho 2018); *M.A.B. v. Bd. of Educ. of Talbot Cnty.*, 286 F. Supp. 3d 704, 718–19 (D. Md. 2018); *Bd. of Educ. of the Highland Loc. Sch. Dist. v. U.S. Dep't of Educ.*, 208 F. Supp. 3d 850, 874 (S.D. Ohio 2016); *Norsworthy v. Beard*, 87 F. Supp. 3d 1104, 1119 (N.D. Cal. 2015); *Adkins v. City of N.Y.*, 143 F. Supp. 3d 134, 139 (S.D.N.Y. 2015).

of the institution. The severe risks to transgender women are well known. *Zollicoffer v. Livingston*, 169 F. Supp. 3d 687, 691) (S.D. Tex. 2016) (the vulnerability of transgender incarcerated women to sexual abuse is "no secret"). Defendants' intentional decision to endanger the lives and wellbeing of transgender women is unspeakably cruel. The gulf between any plausibly legitimate government interest and the actual effect of the policy raises a strong inference that Section 4(a) is motivated by little more than a "bare . . . desire to harm a politically unpopular group." *Romer v. Evans*, 517 U.S. 620, 634 (1996) (alteration in original).

In addition, Section 4(a)'s blanket ban conflicts with BOP's policy of individualized housing placement assessments for incarcerated transgender people, which BOP determined best serves safety and penological interests. U.S. DOJ, *Transgender Offender Manual §§ 5–6* (2022), https://www.bop.gov/policy/progstat/5200-08-cn-1.pdf. The Order provides no legitimate security or penological justification for replacing this established approach with a categorical ban.

The Order relies on "overbroad generalizations," *VMI*, 518 U.S. at 533, by claiming without evidence that transgender women inherently threaten safety in women's facilities. By suggesting transgender individuals seek access to single-sex spaces for improper purposes, the Order depends on stereotypes rather than individual assessments or facts. These broad assumptions fail heightened scrutiny, which requires government actions be based on concrete evidence rather than overgeneralized or hypothetical concerns.

Transgender women pose no unique safety threats to other women, as multiple federal courts have recognized. *See Tay v. Dennison*, 457 F. Supp. 3d 657, 681 (S.D. Ill. 2020) (finding that such unsupported generalizations "are the precise kind of generalized concerns for prison security that courts routinely object"); *Hampton v. Baldwin*, No. 18-CV-550, 2018 WL 5830730, at *11 (S.D. Ill. Nov. 7, 2018) (rejecting the claim that a blanket "policy of placing transgender

-11-

inmates in the facility of their assigned sex at birth is substantially related to the achievement of prison security"); *Doe v. Mass. Dep't of Corr.*, No. 17-12255, 2018 WL 2994403, at *10 (D. Mass. June 14, 2018) (holding that "generalized concerns for prison security are insufficient").

Prior to ████████████, Ms. Jones had only ever been incarcerated in women's facilities. Presumably, for her prior housing assignments, BOP officials weighed her individual circumstance and determined that the safest and most appropriate placement for her is in a women's facility, including because she would be at extremely high risk for physical and sexual assault in a men's prison.

### 3. Section 4(c)'s Categorical Ban on Medical Care Triggers Heightened Scrutiny.

Like Section 4(a), Section 4(c) discriminates based on sex in two ways. First, it creates an explicit sex-based classification by using birth sex as the sole criterion to prohibit certain medical treatments. Second, it discriminates specifically against transgender individuals by denying them essential healthcare while continuing to provide such care—including, in some cases, the same medications—to non-transgender people. Because Section 4(c) establishes these sex-based classifications, it must survive heightened scrutiny to pass constitutional muster.

### 4. Section 4(c) Fails Heightened Scrutiny.

Section 4(c)'s blanket ban on gender transition treatments for incarcerated transgender people fails heightened scrutiny because it lacks a substantial relationship to important governmental interests. The ban categorically overrides medical judgment to deny medically necessary and prescribed care based solely on transgender status. No legitimate medical or penological interest justifies this sweeping prohibition. *See Fields v. Smith*, 712 F. Supp. 2d 830, 868 (E.D. Wis. 2010), *aff'd on other grounds*, 653 F.3d 550 (7th Cir. 2011) (finding "no reasonably conceivable state of facts provides a rational tie" between "prison safety and security" and banning

gender transition care for incarcerated transgender people). This categorical denial constitutes the type of "broad and undifferentiated disability" that heightened scrutiny prohibits. *See Romer*, 517 U.S. at 632.

The provision's complete lack of tailoring fails heightened scrutiny, a standard that requires precision rather than "broad and undifferentiated disability." *Id.* Courts have consistently held that categorical bans on gender transition care lack any rational relationship to legitimate penological interests. *See Fields*, 712 F. Supp. 2d at 868; *Cordellioné v. Comm'r*, No. 23-cv-00135, 2024 WL 4333152, at *17 (S.D. Ind. Sept. 17, 2024).

In Ms. Jones's case, Section 4(c) would strip her of medically necessary hormone therapy that BOP doctors have prescribed since before the start of her incarceration, based solely on her transgender status, with no consideration of her individual circumstances or medical needs. The government's arbitrary discontinuation of established medical care fails to serve any legitimate government interest, much less survive the demanding justification required under heightened scrutiny.

### 5.    Sections 4(a) and 4(c) Fail Even Rational Basis Review Because They Are Based on Animus Toward Transgender People.

The challenged provisions of the Order also violate the requirement of equal protection because they are rooted in animus and thus cannot survive even rational basis review. Like the amendment in *Romer*, the Order singles out a specific group of people and denies them basic protections—here, access to safe housing and medical care—while preserving those protections for others. 517 U.S. at 631–33. The President's campaign statements calling transgender Americans "insane," "deranged," and vowing to "stop the transgender lunacy" only underscore that this discrimination stems from hostility toward transgender people rather than a legitimate purpose. Just as *Moreno* rejected "a bare desire to harm a politically unpopular group" and

*Cleburne* invalidated restrictions based on "mere negative attitudes" and "fear," the Order's withdrawal of established protections, the severe harms it imposes, and the absence of any rational connection to legitimate governmental interests show that it is based on animus and, as such, violates the guarantee of equal protection. *Moreno*, 413 U.S. at 534; *City of Cleburne*, 473 U.S. at 448.

      **B.**     **Ms. Jones Has a Substantial Likelihood of Success on the Merits of Her Eighth Amendment Claims.**

Prison officials violate the Eighth Amendment when they are deliberately indifferent to incarcerated people's serious medical needs or fail to protect incarcerated individuals from a substantial risk of violence at the hands of other incarcerated individuals. *See Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *Farmer v. Brennan,* 511 U.S. 825, 833 (1994). The Order violates the Eighth Amendment by imposing a blanket medical treatment ban that denies necessary care and by mandating that all transgender women must be housed with men, both of which expose Ms. Jones to severe harm.

      **1.**     **The Executive Order Mandates Deliberate Indifference to Ms. Jones's Serious Medical Needs Through Its Blanket Ban on Gender Dysphoria Treatment.**

"[D]eliberate indifference to serious medical needs of prisoners" violates the Eighth Amendment. *Estelle*, 429 U.S. at 104. This analysis requires both objective and subjective components. *Bernier v. Allen*, 38 F.4th 1145, 1151 (D.C. Cir. 2022). The objective component requires a "a known, serious medical condition." *Id*. The subjective component requires that officials possessed "'subjective knowledge of the serious medical need and recklessly disregarded the excessive risk to inmate health or safety from that risk.'" *Id*. (quoting *Anderson v. District of Columbia,* 810 F. Appx. 4, 6 (D.C. Cir. 2020); *Baker v. District of Columbia,* 326 F.3d 1302, 1306 (D.C. Cir. 2003)).

Ms. Jones easily satisfies the objective component. Gender dysphoria is a serious, medically recognized disorder. *See Farmer v. Hawk*, 991 F. Supp. 19, 21 (D.D.C. 1998), *rev'd in part on other grounds sub nom. Farmer v. Moritsugu*, 163 F.3d 610 (D.C. Cir. 1998). Multiple federal courts of appeals have determined that gender dysphoria is "a serious medical condition." *Id.* at 25 (citing *Brown v. Zavaras*, 63 F.3d 967 (10th Cir. 1995); *Phillips v. Michigan Dep't of Corr.*, 731 F. Supp. 792 (W.D. Mich. 1990), *aff'd*, 932 F.2d 969 (6th Cir. 1991); *White v. Farrier*, 849 F.2d 322 (8th Cir. 1988); *Meriwether v. Faulkner*, 821 F.2d 408 (7th Cir. 1987); *Supre v. Ricketts*, 792 F.2d 958 (10th Cir. 1986)); *see also Edmo v. Corizon, Inc.*, 935 F.3d 757, 769 (9th Cir. 2019); *De'Lonta v. Angelone*, 330 F.3d 630, 634 (4th Cir. 2003); *Cuoco v. Moritsugu*, 222 F.3d 99, 106 (2d Cir. 2000). The Order's categorical ban on federally funded medical care for gender dysphoria denies all treatment for this serious condition, including Ms. Jones's prescribed hormone therapy.

For the subjective component, "refusal to provide timely, available, and appropriate treatment for a known, serious medical condition posing excessive risk to an inmate's health or safety [constitutes] deliberate indifference in violation of the Eighth Amendment." *Bernier,* 38 F. 4th at 1151. This includes when treatment decisions are "based exclusively on nonmedical considerations . . . rather than any medical justification." *Id.* The imposition of a blanket ban on medical treatment for gender dysphoria satisfies this component. *See*, *e.g.*, *Keohane v. Fla. Dep't of Corr. Sec'y*, 952 F.3d 1257, 1267 (11th Cir. 2020) (citing *Fields v. Smith*, 653 F.3d 550, 559 (7th Cir. 2011); *Hicklin v. Precynthe*, No. 16-CV-01357, 2018 WL 806764, at *11 (E.D. Mo. Feb. 9, 2018); *Soneeya v. Spencer*, 851 F. Supp. 2d 228, 250 (D. Mass. 2012)). "[R]esponding to an inmate's acknowledged medical need with what amounts to a shoulder-shrugging refusal even to

consider whether a particular course of treatment is appropriate is the very definition of 'deliberate indifference.'" *Keohane*, 952 F.3d at 1266–67.

Defendants have provided Ms. Jones with hormone therapy and permitted her to ██████ ████████████ throughout her incarceration, acknowledging her gender dysphoria diagnosis. (Jones Decl. ¶ 8.) The Order now mandates denial of this medically necessary care, which will cause severe harm as her condition worsens. This deliberate termination of treatment for a recognized serious condition meets the objective and subjective requirements for deliberate indifference. *See Fields*, 653 F.3d at 556 ("Refusing to provide effective treatment for a serious medical condition serves no valid penological purpose and amounts to torture."). Ms. Jones thus demonstrates a strong likelihood of success on this claim.

### 2. The Executive Order Subjects Ms. Jones to Cruel and Unusual Punishment by Failing to Protect Her From a Serious Risk of Bodily Harm.

Ms. Jones has a strong likelihood of success on the merits of her Eighth Amendment claim that Defendants are failing to protect her from a serious risk of bodily harm if they once again transfer her to a men's facility pursuant to the Order. "[P]rison officials have a duty . . . to protect prisoners from violence at the hands of other prisoners." *Farmer,* 511 U.S. at 833 (quoting *Cortes-Quinones v. Jimenez-Nettleship*, 842 F.2d 556, 558 (1st Cir. 1988)). Ms. Jones's failure-to-protect claim requires her to establish both an objective and a subjective element.

The objective element requires showing incarceration "under conditions posing a substantial risk of serious harm." *Id.* at 833. The threatened harm must be "objectively, 'sufficiently serious.'" *Id.* at 834 (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)). Without question, physical and sexual violence constitute objectively serious deprivations. "Being violently assaulted in prison is simply not 'part of the penalty that criminal offenders pay for their offenses against society.'" *Id.* (quoting *Rhodes v. Chapman*. 452 U.S. 337, 347 (1981)).

-16-

Here, Ms. Jones faces clear risks of violence, rape, and sexual assault if she is housed with men. A plaintiff can show exposure to serious harm by demonstrating membership in "an identifiable group of prisoners who are frequently singled out for violent attack." *Id.* at 843. Federal regulations recognize transgender status as increasing "risk of sexual victimization" and require individualized risk assessment for housing decisions. 28 C.F.R. § 115.41(d)(7); *id*. § 115.41. Ms. Jones's long-term hormone therapy, vaginoplasty, and previous placement in women's facilities further demonstrate her heightened risk.

The subjective element requires showing officials "know[] of and disregard[] an excessive risk to inmate health or safety." *Farmer,* 511 U.S. at 837. Courts have consistently found this element satisfied when officials knowingly house transgender women in men's prisons. *See Doe v. District of Columbia*, 215 F. Supp. 3d 62, 77 (D.D.C. 2016) ("[A] jury could infer that [prison officials] knew Doe faced a substantial risk of rape . . . as a transgender woman."); *Stover v. Corr. Corp. of Am*., No. 12-cv-00393, 2015 WL 874288, at *9–10 (D. Idaho Feb. 27, 2015); *Lojan v. Crumbsie*, No. 12-cv-0320, 2013 WL 411356, at *4 (S.D.N.Y. Feb. 1, 2013); *see also Zollicoffer*, 169 F. Supp. 3d at 691 (noting that the "vulnerability of transgender prisoners to sexual abuse is no secret").

The Order's directive to amend 28 C.F.R. § 115.4 to enable blanket transfers of transgender women to men's facilities, regardless of risk, demonstrates Defendants' awareness and disregard of known dangers. This deliberate indifference is further evidenced by Defendants enforcing the Order despite previously acknowledging these risks through Ms. Jones's placement in a women's facility. These facts establish the subjective element of Ms. Jones's failure-to-protect claim, demonstrating a strong likelihood of success on the merits.

**C.**     **Plaintiff Has a Substantial Likelihood of Success on the Merits of Her Administrative Procedure Act Claim.**

The Administrative Procedure Act ("APA") permits judicial review of "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. For an agency action to be considered "final," "the action must mark the consummation of the agency's decision-making process—it must not be of a merely tentative or interlocutory nature." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (internal citations omitted). In addition, the action must either determine "rights and obligations" or be one "from which legal consequences will flow." *Id.* at 178 (internal citations omitted). In other words, the action's impact must be "sufficiently direct and immediate" and have a "direct effect on . . . day-to-day business." *Franklin v. Massachusetts*, 505 U.S. 788, 796-97 (1992) (quoting *Abbot Lab'ys. v. Gardner*, 387 U.S. 136, 152 (1967)).

Executive orders issued by the President are not subject to the APA; however, an agency's action implementing such an order may be the basis of an APA claim. *Int'l Refugee Assistance Project v. Trump*, 373 F. Supp. 3d 650, 665 (D. Md. 2019), *rev'd on other grounds*, 961 F.3d 635 (4th Cir. 2020); *see also Hawaii v. Trump*, 878 F.3d 662, 680–81 (9th Cir. 2017), *rev'd on other grounds*, 585 U.S. 667 (2018) (explaining that once an agency has "consummated" its implementation of a presidential directive such that "legal consequences will flow," the agency's action is final and reviewable under the APA).

The actions taken against Plaintiff here reflect a final agency action. On ████████████, Ms. Jones was transferred to ████████, a men's facility pursuant to the Order. She was immediately placed at a risk of significant physical and psychological harm and remains at risk of being again transferred to a men's facility at any moment if the Executive Order is not restrained. Her APA claim is thus ripe, and a court must set aside the agency action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law," **"**contrary to

-18-

constitutional right, power, privilege, or immunity," or "without observance of procedure required by law." 5 U.S.C. § 706.

The APA was violated on all these grounds. BOP's decision to transfer Ms. Jones was made "without observance of procedure required by law" because BOP did not amend 28 C.F.R. §§ 115.41–42 through notice-and-comment rulemaking before deciding to transfer Ms. Jones. BOP's decision to transfer Ms. Jones to a men's facility and deny her medical care solely because of her birth sex are unconstitutional and thus also violate 5 U.S.C. § 706 (2)(B). The agency action is also arbitrary and capricious because it fails to consider important aspects of the problem or offers an explanation so implausible it cannot be attributed to agency expertise or differing viewpoints. *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Additionally, departing from agency precedent without explanation constitutes arbitrary and capricious action. *Lemoyne-Owen College v. NLRB*, 357 F.3d 55, 60–61 (D.C. Cir. 2004). Courts will also find agency action arbitrary and capricious when it relies on pretextual or contrived reasons. *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019).

The government's actions are "arbitrary and capricious" for each of those reasons. First, the Order mandates housing based on birth sex without considering transgender women like Ms. Jones who have lived as women, had genital surgery, and received medical treatment for gender transition for years. Given the well-documented high rates of harassment, violence, and sexual assault transgender women face in men's prisons, requiring their placement in men's facilities without addressing these safety risks ignores a crucial policy impact. This failure to consider basic facts and provide any rationale violates the *State Farm* standard. 463 U.S. at 43. Second, this unexplained 180-degree reversal from previous BOP policy that allowed Plaintiff to reside in women's facilities throughout her incarceration. *Lemoyne-Owen College*. 357 F.3d at 60–61.

-19-

Third, under *New York*, the policy's devastating impact on thousands of incarcerated persons without demonstrable benefits suggests anti-transgender animus as the true motivation. 588 U.S. at 785.

Finally, the blanket transfer policy also directly conflicts with PREA regulations requiring case-by-case consideration of inmate health, safety, and facility management concerns. 28 C.F.R. § 115.42(c). Together, these factors strongly support success on the APA claim's merits.

## II.   MS. JONES WILL SUFFER IRREPARABLE HARM ABSENT THIS COURT'S INTERVENTION.

The harms Ms. Jones will suffer under the challenged Order are irreparable and require urgent judicial intervention. If she is once again transferred to an all-male facility pursuant to the Order, Ms. Jones will face an extremely high risk of sexual assault, physical violence, and the abrupt discontinuation of her medically necessary hormone therapy. Denying her this critical treatment for gender dysphoria will inflict severe emotional distress—including a high risk of suicidality—and irreversible physical changes. These imminent injuries, both physical and psychological, cannot be remedied through monetary compensation. Moreover, as set forth above, Ms. Jones's constitutional rights will be directly infringed by these actions, compounding the severity of the harm.

Courts recognize that immediate threats to safety, health, and constitutional rights constitute irreparable harm warranting urgent relief. *See Al-Joudi v. Bush,* 406 F. Supp. 2d 13, 20 (D.D.C. 2005) (finding irreparable harm in connection with constitutional violation); *Wilson v. Group Hosp. & Med. Servs., Inc.*, 791 F. Supp. 309, 314 (D.D.C. 1992) finding irreparable harm in connection with threats to health). Moreover, courts in this Circuit routinely find irreparable harm where there is an alleged loss of constitutional freedoms—even if temporary. *Mills v. D.C.*, 571 F.3d 1304, 1312 (D.C. Cir. 2009) (finding irreparable harm in connection with alleged Fourth

Amendment violation, and explaining that "it has long been established that the loss of constitutional freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury") (citation and internal quotations omitted)). Ultimately, irreparable harm exists when a plaintiff shows she will likely suffer harm that is "beyond remediation." *Davis v. Billington*, 76 F. Supp. 3d 59, 65 (D.D.C. 2014).

Here, Ms. Jones faces a number of imminent and irreparable harms. Without appropriate medical treatment, gender dysphoria can result "in debilitating psychological harms, including anxiety, depression, suicidality, and other mental health issues." (Meade Decl. ¶ 2.) The termination of Ms. Jones's medical treatment "constitutes a serious medical risk that can severely impact" her physical and mental health. (*Id.* ¶ 9.) These harms—which Ms. Jones will experience if BOP once again transfers her to a men's facility and which she presently faces with the looming cessation of her critical medical care—will only become more severe before final resolution of Ms. Jones's Preliminary Injunction application, necessitating immediate judicial intervention. Due to the implementation of the Order, Ms. Jones faces a risk of sexual violence, psychological harm, and termination of medical care—injuries that no monetary damages can remedy.

A.    **Ms. Jones Faces Irreparable Harm by Being Subjected to an Extremely High Risk of Violence and Sexual Abuse.**

Courts nationwide have recognized that housing transgender women in men's facilities dramatically increases the danger of harassment and violence. *See, e.g.*, *Greene v. Bowles*, 361 F.3d 290, 292 (6th Cir. 2004) (describing a severe physical attack against a transgender woman by another incarcerated person); *Hampton v. Baldwin*, No. 18-CV-550, 2018 WL 5830730, at *2 (S.D. Ill. Nov. 7, 2018) (describing incidents of severe sexual misconduct against a transgender woman by prison staff and physical attack by a male incarcerated person); *Tay v. Dennison*, 457 F. Supp. 3d 657, 664–68 (S.D. Ill. 2020) (same).

Establishing irreparable harm does not require proof that Ms. Jones has personally suffered physical violence or sexual abuse. Courts have consistently held that the serious and foreseeable threat of harm to transgender women housed in all-male facilities constitutes irreparable harm. *See, e.g.*, *Tay*, 457 F. Supp. 3d at 685–87 (finding irreparable harm where plaintiff was physically endangered due to risk of sexual assault and threats); *Becker v. Sherman*, No. 16-cv-0828, 2017 WL 6316836, at *5 (E.D. Cal. Dec. 11, 2017) (finding reasonable fear of future harm for transgender inmate based on past assaults and vulnerability in a male prison, despite experiencing periods without assault); *Lojan v. Crumbsie*, No. 12-CV-0320, 2013 WL 411356, at *4 (S.D.N.Y. Feb. 1, 2013) (holding that knowledge of an inmate's transgender status was sufficient to alert defendants of vulnerability and need for protection).

Here, the risk of sexual violence is heightened because Ms. Jones has been on hormone therapy for nearly ██ years, has received genital surgery, and has female sex characteristics. (Jones Decl. ¶¶ 5–6.)

**B.      Ms. Jones Faces Irreparable Harm by Being Denied Essential Medical Care.**

The Order threatens to halt Ms. Jones's decade-long hormone therapy for gender dysphoria, risking immediate and irreversible physical harm. When faced with "requests for preliminary injunctive relief, courts often find a showing of irreparable harm where the movant's health is in imminent danger." *Al-Joudi*, 406 F. Supp. 2d at 20 (finding irreparable harm and granting preliminary injunction where plaintiffs alleged that lack of precautionary measures at department of correction's facility increased their risk of serious health consequences from COVID-19); *Wilson*, 791 F. Supp. at 314 (finding irreparable harm and granting preliminary injunction cancer patient's "health and future remain[ed] in serious doubt" and insurance carrier refused to pay for life-saving treatment).

As other courts have recognized, the denial of medical care for gender dysphoria can lead to severe psychological harm—including risk of self-harm and suicide. *See, e.g.*, *Battista v. Clarke*, 645 F.3d 449, 455 (1st Cir. 2011) (explaining that it is "a disorder that can be extremely dangerous," including leading to "self-mutilation"); *Adams*, 716 F. Supp. 2d at 109 (discussing the "risk of serious harm including depression, anxiety, self-mutilation, and suicide"); *Barrett v. Coplan*, 292 F. Supp. 2d 281, 286 (D.N.H. 2003) (recognizing gender dysphoria as a "serious condition recognized by the medical community that frequently requires treatment," and can lead to suicidality); *see also, e.g.*, *Monroe v. Baldwin*, 424 F. Supp. 3d 526, 545 (S.D. Ill. 2019) *vacated and remanded on other grounds*, 122 F.4th 688 (7th Cir. 2024) ("there is no doubt that Plaintiffs face irreparable harm that cannot be compensated by monetary damages" where deprivation of treatment for gender dysphoria resulted in depression and suicidal ideation).

Ms. Jones has less than a thirty-day supply of hormone treatment remaining and has already been told that her prescription will not be renewed. (Jones Decl. ¶ 15.) Terminating Ms. Jones's daily hormone treatment will cause immediate health deterioration, establishing irreparable injury. *MH v. Adams*, No. 22-cv-00409, 2024 WL 3237006, at *7 (D. Idaho June 29, 2024) (holding that halting treatment for gender dysphoria constitutes irreparable harm).

## C.    Deprivation of Constitutional Rights Also Constitutes Irreparable Harm.

Finally, relief is warranted because constitutional violations constitute irreparable harm. *Davis v. District of Columbia*, 158 F.3d 1342, 1346 (D.C. Cir. 1998*)* ("[A] prospective violation of a constitutional right constitutes irreparable injury."); *Costa v. Bazron*, 464 F. Supp. 3d 132, 156 (D.D.C. 2020) (finding that harm imposed by alleged Fifth Amendment violation was "itself irreparable" and granting preliminary injunction); *Pursuing Am.'s Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 511 (D.C. Cir. 2016) (finding that harm imposed by alleged First

Amendment violation was "irreparable" and remanding district court's denial of a preliminary injunction).

## III.    THE BALANCE OF HARMS AND PUBLIC INTEREST WEIGH HEAVILY IN FAVOR OF EMERGENCY RELIEF.

The balance of equities strongly favors Ms. Jones. "'The final two factors the Court must consider when deciding whether to grant a [temporary restraining order] are the balance of harms and the public interest.'" *Pushkar v. Blinken,* No. CV-21-2297, 2021 WL 4318116, at *12 (D.D.C. Sept. 23, 2021) (quoting *Sierra Club v. U.S. Army Corps of Eng'rs*, 990 F. Supp. 2d 9, 41 (D.D.C. 2013)). When "the government is a party to the litigation, these two factors merge and are 'one and the same, because the government's interest is the public interest.'" *Id.* (quoting *Pursuing Am.'s Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 511 (D.C. Cir. 2016)).

Here, the Government does not have any bona fide interest at issue. Rather, it is "always in the public interest to prevent the violation of a party's constitutional rights." *Banks v. Booth*, 468 F. Supp. 3d 101, 124 (D.D.C. 2020) (internal citations omitted). It is also in the public interest to ensure Ms. Jones's health and safety and ensure that prison policies reflect careful, reasoned judgment, not bias or abrupt change with no consideration of penological interests. Further, Ms. Jones's interest in avoiding the potential harms posed by the Order is strong. Throughout her entire custodial term until ████████████████, Ms. Jones was safely housed in women's facilities while receiving essential hormone therapy. Her transfer to a men's facility exposed her to serious risks of violence, sexual assault, and emotional trauma and she remains at risk of returning to a men's facility at any moment. In contrast, as they have already demonstrated by transferring Ms. Jones back to a women's facility on ███████████, Defendants face no hardship in reverting to their longstanding practices before the imposition of the Order, which align with federal law and constitutional requirements. Ultimately, Ms. Jones seeks no more than to maintain the status quo

that existed on January 20, 2025, and avoid the risks posed by being transferred to a men's facility again.

**<u>CONCLUSION</u>**

For the foregoing reasons, Ms. Jones seeks the immediate requested relief.

Respectfully submitted,

Dated: February 21, 2025

/s/ Jennifer Fiorica Delgado
Jennifer Fiorica Delgado (Bar No. NY296)
Alexander Shalom (admission forthcoming)
Natalie Kraner (admission forthcoming)
Wayne Fang (*pro hac vice* pending)
Markiana J. Julceus (*pro hac vice* pending)
**Lowenstein Sandler LLP**
1251 Avenue of the Americas
New York, NY 10020
(862) 926-2029
jdelgado@lowenstein.com
ashalom@lowenstein.com
nkraner@lowenstein.com
wfang@lowenstein.com
mjulceus@lowenstein.com

Jennifer L. Levi (admission forthcoming)
Sarah Austin (*pro hac vice* pending)
**GLBTQ Legal Advocates & Defenders**
18 Tremont Street, Suite 950
Boston, MA 02108
(617) 426-1350
bklein@glad.org
jlevi@glad.org
saustin@glad.org

Christopher F. Stoll (*pro hac vice* pending)
Amy Whelan (*pro hac vice* pending)
**National Center for Lesbian Rights**
870 Market Street, Suite 370
San Francisco, CA 94102
(415) 392-6257
cstoll@nclrights.org
awhelan@nclrights.org

-25-
