# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JANE JONES,<br><br>               Plaintiff,<br><br>    v.<br><br>DONALD TRUMP, in his official capacity as President of the United States, *et al.*,<br><br>               Defendants. | Civil Docket No. 1:25-cv-401 |

## DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................................ 1

BACKGROUND ............................................................................................. 4

A.    BOP's Inmate Designation Authority and Process ............................ 4

B.    The Prison Rape Elimination Act .................................................... 5

C.    BOP's Security Protocol for Inmate Safety ..................................... 6

D.    The Executive Order and BOP's Implementation ............................ 8

E.    Procedural History .......................................................................... 9

LEGAL STANDARD ................................................................................... 10

ARGUMENT .............................................................................................. 10

I.    THIS COURT LACKS AUTHORITY TO REVIEW THIS CASE ................... 10

      A.    Section 3621's Nonreviewability Provision Bars Plaintiff's
            Challenge to BOP's Placement Decision .............................. 10

      B.    Plaintiff Has Failed to Exhaust Administrative Remedies ................. 12

II.   PLAINTIFF HAS NOT DEMONSTRATED A LIKELIHOOD OF
      SUCCESS ON THE MERITS ............................................................... 15

      A.    Plaintiff Is Unlikely to Succeed on The Equal Protection Claim ......... 15

      B.    Plaintiff Is Unlikely to Succeed on the Eighth Amendment
            Claim ................................................................................. 25

      C.    Plaintiff Is Unlikely to Succeed on the APA Claim .............................. 32

III.  PLAINTIFF HAS NOT DEMONSTRATED IRREPARABLE HARM ........... 34

IV.   THE BALANCE OF EQUITIES AND PUBLIC INTEREST FAVOR
      DEFENDANTS ................................................................................ 35

V.    ANY INJUNCTIVE RELIEF MUST COMPLY WITH THE PLRA ............... 35

VI.   RELIEF AGAINST THE PRESIDENT IS IMPROPER ................................. 36

CONCLUSION .............................................................................................. 37

# TABLE OF AUTHORITIES

## Cases

*Abbott Labs. v. Gardner,*
  387 U.S. 136 (1967) ................................................................................................ 24

*Bell v. Wolfish,*
  441 U.S. 520 (1979) ................................................................................................ 16

*Bennett v. Spear,*
  520 U.S. 154 (1997) ................................................................................................ 33

*Bernier v. Allen,*
  38 F.4th 1145 (D.C. Cir. 2022) ......................................................................... 25, 31

*Bolling v. Sharpe,*
  347 U.S. 497 (1954) ................................................................................................ 15

*Booth v. Churner,*
  532 U.S. 731 (2001) ................................................................................. 2, 12, 14, 15

*Chaplaincy of Full Gospel Churches v. England,*
  454 F.3d 290 (D.C. Cir. 2006) ............................................................................... 35

*City of Cleburne v. Cleburne Living Ctr., Inc.,*
  473 U.S. 432 (1985) ................................................................................................ 15

*ConverDyn v. Moniz,*
  68 F. Supp. 3d 34 (D.D.C. 2014) ........................................................................... 35

*Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.,*
  603 U.S. 799 (2024) ................................................................................................ 33

*Doe v. McHenry,*
  2025 WL 388218 (D.D.C. Feb. 4, 2025) ......................................................... *passim*

*Encino Motorcars, LLC v. Navarro,*
  579 U.S. 211 (2016) ................................................................................................ 34

*Erickson v. Pardus,*
  551 U.S. 89 (2007) .................................................................................................. 31

*Estelle v. Gamble*,
   429 U.S. 97 (1976) ............................................................................... 2, 25, 26

*Farmer v. Brennan*,
   511 U.S. 825 (1994) ..................................................................................... 25

*FCC v. Fox Television Stations, Inc.*,
   556 U.S. 502 (2009) ..................................................................................... 34

*Foy v. United States*,
   285 F.R.D. 407 (N.D. Iowa 2012) ............................................................... 10

*Hanson v. District of Columbia*,
   120 F.4th 223 (D.C. Cir. 2024) ................................................................... 10

*Harrison v. Kernan*,
   971 F.3d 1069 (9th Cir. 2020) ..................................................................... 23

*Hatim v. Obama*,
   760 F.3d 54 (D.C. Cir. 2014) ................................................... 16, 17, 18, 36

*Heller v. Doe*,
   509 U.S. 312 (1993) ..................................................................................... 18

*Inmates of Occoquan v. Barry*,
   844 F.2d 828 (D.C. Cir. 1988) ..................................................................... 25

*Johnson v. California*,
   543 U.S. 499 (2005) ................................................................................. 2, 19

*Jones v. Bock*,
   549 U.S. 199 (2007) ................................................................................. 2, 13

*Jones v. North Carolina Prisoners' Union*,
   433 U.S. 119 (1977) ..................................................................................... 16

*Kaemmerling v. Lappin*,
   553 F.3d 669 (D.C. Cir. 2008) ..................................................................... 15

*Keohane v. Fla. Dep't of Corr. Sec'y*,
   952 F.3d 1257 (11th Cir. 2020) ................................................................... 30

*Kosilek v. Spencer*,
   774 F.3d 63 (1st Cir. 2014) .................................................................... 26, 30

*Lamb v. Norwood,*
   899 F.3d 1159 (10th Cir. 2018) ............................................................................. 30

*McCarthy v. Madigan,*
   503 U.S. 140 (1992) ............................................................................................... 13

*Michael M. v. Superior Court,*
   450 U.S. 464 (1981) ............................................................................................... 15

*Nat'l Ass'n of Home Builders v. EPA,*
   682 F.3d 1032 (D.C. Cir. 2012) ............................................................................. 34

*Nat'l Mining Ass'n v. Jackson,*
   768 F. Supp. 2d 34 (D.D.C. 2011) ......................................................................... 35

*Nken v. Holder,*
   556 U.S. 418 (2009) ............................................................................................... 10

*Pitts v. Thornburgh,*
   866 F.2d 1450 (D.C. Cir. 1989) ............................................................................. 23

*Plyler v. Doe,*
   457 U.S. 202 (1982) ............................................................................................... 15

*Porche v. Salazar,*
   No. 3:19-CV-00077, 2019 WL 1373683 (D. Or. Mar. 5, 2019) ............................. 11

*Preiser v. Rodriguez,*
   411 U.S. 475 (1973) ............................................................................................... 16

*Rhodes v. Chapman,*
   452 U.S. 337 (1981) ............................................................................................... 16

*Royer v. BOP,*
   933 F. Supp. 2d 170 (D.D.C. 2013) ................................................................. 11, 12

*Ross v. Blake,*
   578 U.S. 632 (2016) ............................................................................................... 12

*Saline Parents v. Garland,*
   88 F.4th 298 (D.C. Cir. 2023) ................................................................................ 24

*Steffan v. Perry,*
   41 F.3d 677 (D.C. Cir. 1994) ................................................................................. 18

*Stoddard v. District of Columbia,*
   764 F. Supp. 2d 213 (D.D.C. 2011) ................................................................ 25, 29

*Trump v. Hawaii,*
   585 U.S. 667 (2018) ............................................................................................. 19

*\*Turner v. Safley,*
   482 U.S. 78 (1987) ....................................................................................... *passim*

*United States v. Vang,*
   No. CR 16-277, 2020 WL 4704875 (D. Minn. Aug. 13, 2020) ................................ 11

*Vance v. Bradley,*
   440 U.S. 93 (1979) ............................................................................................... 18

*Veney v. Wyche,*
   293 F.3d 726 (4th Cir. 2002) ............................................................................... 16

*Webster v. Doe,*
   486 U.S. 592 (1988) ..................................................................................... 1, 2, 11

*Wills v. Barnhardt,*
   No. 21-1383, 2022 WL 4481492 (10th Cir. Sept. 27, 2022) .................................. 11

*Winter v. Nat. Res. Def. Council, Inc.,*
   555 U.S. 7 (2008) ................................................................................................. 10

*Wis. Gas. Co. v. FERC,*
   758 F.2d 669 (D.C. Cir. 1985) ............................................................................. 35

*\*Women Prisoners of D.C. Dep't of Corr. v. District of Columbia,*
   93 F.3d 910 (D.C. Cir. 1996) ........................................................................ *passim*

*\*Woodford v. Ngo,*
   548 U.S. 81 (2006) ..................................................................................... 9, 12, 13

**Statutes**

5 U.S.C. § 704 ...................................................................................................... 3

18 U.S.C. § 3621 .......................................................................................... *passim*

18 U.S.C. § 3625 ...................................................................................... 3, 11, 32

18 U.S.C. § 3626 .................................................................................................. 36

42 U.S.C. § 1997e ................................................................................................ 12

**Regulations**

28 C.F.R. § 115.41 ............................................................................................... 5

28 C.F.R. § 115.42 ............................................................................................... 5

28 C.F.R. §§ 542.13 ............................................................................................. 13

Executive Order 14168,
   90 Fed. Reg. 8615, 2025 WL 327882 (Jan. 20, 2025) ..................................... *passim*

**INTRODUCTION**

On the day he took office, the President issued an Executive Order requiring the Federal Bureau of Prisons ("BOP") to ensure that "males are not detained in women's prisons." Exec. Order 14168, § 4(a), 90 Fed. Reg. 8615, 2025 WL 327882 (Jan. 20, 2025). The Executive Order also requires BOP to revise its guidance concerning medical care so that no Federal funds are expended "for the purpose of conforming an inmate's appearance to that of the opposite sex." *Id.*, § 4(c).

In *Doe v. McHenry*, this Court has preliminary enjoined BOP from transferring three biological male inmates who identify as female to men's facilities. *See Doe v. McHenry*, No. 1:25-CV-286-RCL, 2025 WL 388218 (D.D.C. Feb. 4, 2025) (TRO opinion); Prelim. Inj., *Doe v. McHenry*, No. 1:25-CV-286-RCL (D.D.C. Feb. 18, 2025), ECF No. 44. The Court also required BOP to "continue the plaintiffs' . . . medical care as [it] existed immediately prior to January 20, 2025." *Doe*, 2025 WL 388218, at *5. While the Court held, based on the limited record before it, that the *Doe* plaintiffs had demonstrated "a sufficient likelihood of success" on their Eighth Amendment claim, the Court did not find that they are likely to succeed on their Equal Protection and Administration Procedure Act ("APA") claims. *Id.* at *4. Further, the Court recognized that it was "possible that further briefing of the constitutional issues at the center of [those parties'] dispute, or factual discovery, will yield a different outcome." *Id.* at *5. Indeed, BOP is still developing the guidance on medical care that is the subject of the *Doe* plaintiffs' challenge.

Plaintiff Jane Jones, proceeding under a pseudonym, is a biological male who identifies as female and is currently housed in a BOP women's facility. Raising the same claims as the *Doe* plaintiffs, Plaintiff moves for a temporary restraining order ("TRO") or preliminary injunction to seek the same relief. As explained below, Plaintiff's motion should be denied.

*First*, Plaintiff's challenge to BOP's transfer decision is not subject to judicial review. The First Step Act makes clear that "[n]otwithstanding any other provision of law," BOP determinations as to placement are "not reviewable by any court." 18 U.S.C. § 3621(b). In *Doe*, the Court held that § 3621(b) was not sufficiently clear to bar judicial review of constitutional claims, relying on *Webster v. Doe*, 486 U.S. 592 (1988). But the statute at issue in *Webster* did not contain an express nonreviewability provision like the one in § 3621(b). Congress could not have been clearer in the First Step Act that it intended to preclude all judicial review of BOP placement decisions.

*Second*, Plaintiff has failed to exhaust administrative remedies. The Supreme Court has made clear that exhaustion is mandatory. *Jones v. Bock*, 549 U.S. 199, 211 (2007). As this Court recognized in *Doe*, this mandatory exhaustion requirement applies even if plaintiffs believe exhaustion would be futile, and even if plaintiffs are bringing constitutional claims. 2025 WL 388218, at *3. The Court nonetheless held that the *Doe* plaintiffs' claims fell within a "narrow exception" to the exhaustion requirement, which is when remedies are not "available" to the inmate. *Id.* But that exception does not apply here because prison officials could still take "some action" in response to Plaintiff's complaint, even if they cannot provide "the remedial action [the] inmate demands." *Booth v. Churner*, 532 U.S. 731, 736 (2001).

*Third*, Plaintiff is unlikely to succeed on the Equal Protection claim. That claim is subject to the deferential standard of review set forth in *Turner v. Safley*, 482 U.S. 78 (1987), under which prison policies will be upheld so long as they are "reasonably related to legitimate penological interests." *Id.* at 89. In *Doe*, the plaintiffs argued that heightened scrutiny should instead apply under *Johnson v. California*, 543 U.S. 499 (2005), which considered a racial classification. But the Court correctly recognized that there is "good reason to doubt" that *Johnson* applies in this context and declined to hold that the plaintiffs had a likelihood of success on

2

their Equal Protection claim. 2025 WL 388218, at *4. Plaintiff likewise has not established a likelihood of success on the Equal Protection claim here.

*Fourth*, Plaintiff is not likely to succeed on the Eighth Amendment claim. Plaintiff has not shown that housing a biological male who identifies as a woman in a men's facility constitutes "unnecessary and wanton infliction of pain" that is "repugnant to the conscience of mankind." *Estelle v. Gamble*, 429 U.S. 97, 103 (1976). The vast majority (99%) of biological males who identify as females in BOP custody are housed in men's facilities. The Court in *Doe* nonetheless held that that the plaintiffs there were likely to succeed on this claim because of statistics from more than a decade ago showing that individuals who identify with the opposite biological sex generally are at an elevated risk of sexual assault when housed in a facility corresponding to their biological sex. 2025 WL 388218, at *5. Defendants dispute that generalized statistics from over ten years ago show an increased risk of harm to Plaintiff in this case. Indeed, there is no evidence showing that the planned transfer to the *particular* low-security facility at issue here would lead to a substantial risk of harm. And, as explained in the attached Declaration of Rick Stover, the rate of violence at Plaintiff's current women's facility is *higher* than the rate of violence at the facility to which Plaintiff would be transferred. *See* Stover Decl. ¶ 9. Nor can the Court assume that BOP's yet-to-be-revised guidance on the medical care at issue will result in the denial of necessary medical care to Plaintiff.

*Fifth*, Plaintiff's claim under the Administrative Procedure Act is unlikely to succeed. As this Court recognized in *Doe*, "18 U.S.C. § 3625 dictates that the APA 'does not apply to'" placement decisions. 2025 WL 388218, at *2; *see id.* (collecting cases). And Plaintiff cannot challenge BOP's possible future denial of medical care under the APA either, as BOP has not taken any "final agency action," 5 U.S.C. § 704, to implement the Executive Order in that regard.

3

For all these reasons, the Court should deny Plaintiff's motion for a TRO or preliminary injunction. If, however, the Court enters a TRO, Defendants respectfully request 10 days from the date of that order to file an opposition to Plaintiff's motion for a preliminary injunction.

## BACKGROUND

### A.    BOP's Inmate Designation Authority and Process

The Court is familiar with the general background. *See Doe*, 2025 WL 388218, at *1. Congress has vested in BOP the decision-making authority to classify and designate inmates to particular prisons. *See* 18 U.S.C. § 3621(b). Specifically, BOP "may designate any available penal or correctional facility that meets minimum standards of health and habitability established by the Bureau." *Id.* BOP also "may at any time . . . direct the transfer of a prisoner from one penal or correctional facility to another." *Id.*

There are approximately 2,198 inmates who identify with the opposite biological sex in BOP facilities and halfway houses. Stover Decl. ¶ 5. Of those, 1,488 are biological male inmates who identify as female, and 710 are biological female inmates who identify as male. *Id.*

Since 2017, BOP has had a manual on how to manage inmates who identify as the opposite biological sex, and that manual has been revised over time. From May 2018 to January 2022, for example, the manual provided that in deciding the facility assignment for an inmate who identifies with the opposite biological sex, BOP would "use biological sex as the initial determination for designation." 2018 Guidance § 5. The guidance further provided that "designation to a facility of the inmate's identified gender would be appropriate only in rare cases after consideration of all of the [identified] factors." *Id.* The manual was revised in January 2022 to provide that in deciding the facility assignment for an inmate who identifies with the opposite

4

biological sex, BOP would consider, among other things, the inmate's "current gender expression."  2022 Guidance § 5.

## B.    The Prison Rape Elimination Act

Congress enacted the Prison Rape Elimination Act ("PREA") in 2003 to establish national standards for the prevention of sexual assault in prisons and detention facilities in the United States.  *See* 34 U.S.C. §§ 30301-30309.  The statute does not contain any substantive requirements, nor does it reference inmates who identify with the opposite biological sex or promote gender ideology.  Instead, the statute established the National Prison Rape Elimination Commission to study the "penological, physical, mental, medical, social, and economic impacts of prison rape in the United States."  34 U.S.C. § 30306(d).  The statute also directed the Attorney General to promulgate regulations based on the Commission's study, which the Attorney General did in 2012.  *See* 28 C.F.R. part. 115.

The resulting PREA regulations require that correctional institutions assess all inmates during an "intake screening" and upon transfer to another facility for their risk of being sexually abused by other inmates, 28 C.F.R. § 115.41(a), and that such screening consider a range of factors, *see id.* § 115.41(d), including whether the inmate "is or is perceived to be gay, lesbian, bisexual, transgender, intersex, or gender nonconforming."  *Id.* § 115.41(d)(7).  The agency then must use that screening information to inform housing and other assignments with "the goal of keeping separate those inmates at high risk of being sexually victimized and from those at high risk of being sexually abusive."  *Id.* § 115.42(a).

Further, the regulations provide that "[i]n deciding whether to assign a transgender or intersex inmate to a facility for male or female inmates, and in making other housing and programming assignments, the agency shall consider on a case-by-case basis whether a placement would ensure the inmate's health and safety, and whether the placement would present management or security problems."  *Id.*

5

§ 115.42(c).    The regulations also require prison officials to give "serious consideration" to "[a] transgender or intersex inmate's own views with respect to his or her own safety." *Id.* § 115.42(e).    There is no requirement under the PREA regulations that an inmate who identifies with the opposite biological sex be placed in a facility that is consistent with the inmate's identified sex.

The PREA regulations further require correctional institutions such as BOP to "provide multiple internal ways for inmates to privately report sexual abuse and sexual harassment, retaliation by other inmates or staff for reporting sexual abuse and sexual harassment, and staff neglect or violation of responsibilities that may have contributed to such incidents."  28 C.F.R. § 115.51(a).  "The agency shall also provide at least one way for inmates to report abuse or harassment to a public or private entity or office that is not part of the agency, and that is able to receive and immediately forward inmate reports of sexual abuse and sexual harassment to agency officials, allowing the inmate to remain anonymous upon request."  *Id.* § 115.51(b).

## C.    BOP's Security Protocol for Inmate Safety

BOP recognizes the importance of protecting inmates from sexually abusive behavior and ensuring their continued safety.  *See generally* Stover Decl. ¶¶ 12–16.  BOP Program Statement 5324.12 states that BOP has a "zero tolerance" policy toward all forms of sexual activity in the custodial environment, including sexual abuse and sexual harassment.  *Id.* ¶ 12.  Routine training is provided to all BOP staff to help detect incidents, perpetrators, and inmate victims of sexually abusive behavior.  *Id.*  BOP staff are educated to intervene properly and in a timely manner.  *Id.*  BOP staff are also required to document, report, and investigate reported incidents.  *Id.*  Moreover, BOP is responsible for disciplining and referring for prosecution perpetrators of sexually abusive behavior against other inmates.  *Id.*

BOP trains all institutional staff to monitor and to intervene when they observe problematic interactions between inmates. *Id.* ¶ 13. At each BOP institution, staff review a "Posted Picture File" of inmates who are potentially disruptive, escape risks, or present a threat to staff or institutional security. *Id.* The BOP identifies inmates who, because of their prior record, current offense, institutional adjustment, or other factors, pose a significant threat to inmate or staff safety, the institution's security, or the surrounding community's welfare. *Id.* The Posted Picture File is updated at least quarterly. *Id.* Institution staff review the file regularly to determine which inmates have a history of assaultive behavior or sexual offenses. *Id.*

BOP's PREA intake screening of inmates includes asking inmates about their own perception of their safety and history of sexual assault. *Id.* ¶ 14. BOP staff also assess the inmate's general physical appearance and presentation and review the inmate's criminal history. *Id.* If at any time BOP staff believe that an inmate's safety may be seriously jeopardized by placement in the general population, the inmate may be housed in more restrictive conditions as a protective custody case in the Special Housing Unit. *Id.* ¶ 15. When an inmate is placed in administrative detention for placement, the Warden or a designee must review the placement within two workdays of the placement to determine if continued protective custody is necessary. *Id.* This includes reviewing documents that led to the inmate being placed in protective custody and any other documents pertinent to the inmate's protection. *Id.*

Inmates have numerous ways to report sexual assault or sexual harassment. *Id.* ¶ 16. An inmate can send the Warden an "Inmate Request to Staff Member" or a letter reporting the sexually abusive behavior. *Id.* An inmate may also send a letter to the Regional Director or Director of the Bureau of Prisons. *Id.* Finally, an inmate can file a Request for Administrative Remedy. *Id.* If the inmate determines that the complaint is too sensitive to file with the Warden, the inmate can file the administrative remedy directly with the Regional Director. *Id.* The inmate can also

7

email or write the Office of Inspector General ("OIG"), which investigates certain allegations of staff misconduct. *Id.*

Finally, an inmate can send reports of sexual abuse to a dedicated email address managed by OIG, and the inmate can request that the report remain confidential. *Id.* OIG is independent of BOP. *Id.* OIG protects the identity of victims and other individuals who report allegations to the greatest extent possible, while still thoroughly vetting and investigating the allegations. *Id.*

**D.    The Executive Order and BOP's Implementation**

On January 20, 2025, the President issued an Executive Order titled, "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government."  The Executive Order provides that "[i]t is the policy of the United States to recognize two sexes, male and female," Exec. Order 14168, § 2, 90 Fed. Reg. 8615 and that "'sex' shall refer to an individual's immutable biological classification as either male or female," *id.* § 2(a).  Section 4(a) of the Executive Order, titled "Privacy in Intimate Spaces," provides:

> The Attorney General and Secretary of Homeland Security shall ensure that males are not detained in women's prisons or housed in women's detention centers, including through amendment, as necessary, of Part 115.41 of title 28, Code of Federal Regulations and interpretation guidance regarding the Americans with Disabilities Act.

Section 4(c) of the Executive Order further provides:

> The Attorney General shall ensure that the Bureau of Prisons revises its policies concerning medical care to be consistent with this order, and shall ensure that no Federal funds are expended for any medical procedure, treatment, or drug for the purpose of conforming an inmate's appearance to that of the opposite sex.

The Executive Order also requires that "it shall be implemented consistent with applicable law and subject to the availability of appropriations."  Exec. Order § 8(b).

Plaintiff is a biological male inmate housed in a BOP women's facility. The complaint alleges that Plaintiff suffers from gender dysphoria and has had sex-reassignment surgeries, including a vaginoplasty. Compl. ¶¶ 2–3. Except for a brief period after the issuance of Executive Order 14168, Plaintiff has been housed in a women's facility. *Id.* ¶3.

In implementing the Executive Order and in selecting the most appropriate future placement for Plaintiff in a men's facility, BOP took into consideration Plaintiff's assigned security level, disciplinary record, medical record, and psychology record. Stover Dec. ¶ 7. BOP especially considered the fact that Plaintiff has had sex-reassignment surgery and looked for a facility that can address Plaintiff's medical care needs. *Id.* Based on these factors, BOP decided to place Plaintiff at ██████████

███████████████████████████████████████████████████████

███████████████████████████████ *Id.* ¶¶ 8, 10. BOP also determined that housing Plaintiff at ████████████ greatly reduces the chance of the inmate being victimized by other inmates because ████████████

███████████████████████████████ *Id.* ¶ 8. In 2024, ████

████████ which has a population of ████ total inmates, had a total of █ guilty findings of assaults on inmates (or ████ % of the population). *Id.* ¶ 9. By contrast, the women's facility in which Plaintiff is currently housed, which has a population of ████ inmates, had a total of █ guilty findings of assaults on inmates in 2024 (or █ % of the population). *Id.* ████████████████████████████

███████████████████████ *Id.* ¶ 9.

### E.    Procedural History

Plaintiff filed this suit on February 10, 2025, raising claims under (i) the Equal Protection Clause of the Fifth Amendment, (ii) the Eighth Amendment, (iii) the Rehabilitation Act, and (iv) the Administrative Procedure Act. On February 21,

9

Plaintiff moved for a TRO or a preliminary injunction, relying on the Equal Protection, Eighth Amendment, and APA claims.

## LEGAL STANDARD

A temporary restraining order is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). To obtain such extraordinary relief, a plaintiff "must show (1) 'he is likely to succeed on the merits,' (2) 'he is likely to suffer irreparable harm in the absence of preliminary relief,' (3) 'the balance of equities tips in his favor,' and (4) issuing 'an injunction is in the public interest.'" *Hanson v. District of Columbia*, 120 F.4th 223, 231 (D.C. Cir. 2024) (quoting *Winter*, 555 U.S. at 20). Where, as here, the defendants are government entities or official sued in their official capacities, the balance of equities and the public interest factors merge. *See Nken v. Holder*, 556 U.S. 418, 435 (2009).

## ARGUMENT

## I.    THIS COURT LACKS AUTHORITY TO REVIEW THIS CASE

### A.    Section 3621's Nonreviewability Provision Bars Plaintiff's Challenge to BOP's Placement Decision

Congress has vested in BOP the discretion to "designate the place of the prisoner's imprisonment" and to "direct the transfer of a prisoner from one penal or correctional facility to another." 18 U.S.C. § 3621(b). "Federal courts have long held that Section 3621(b) gives the executive branch, not the courts, primary authority with regard to a prisoner's place of confinement." *Foy v. United States*, 285 F.R.D. 407, 410 (N.D. Iowa 2012). And in 2018, Congress amended § 3621(b) to expressly bar judicial review of BOP's designation decisions. Specifically, Congress provided that "[n]otwithstanding any other provision of law, a designation of a place of imprisonment under [18 U.S.C. § 3621(b)] is not reviewable by any court." *Id.*

In light of this nonreviewability provision, "[c]ourts have consistently held that placement questions are not reviewable." *United States v. Vang*, No. CR 16-277, 2020 WL 4704875, at *2 (D. Minn. Aug. 13, 2020) (collecting cases). This includes challenges to BOP decisions regarding inmate transfers. *See Porche v. Salazar*, No. 3:19-CV-00077, 2019 WL 1373683, at *1 (D. Or. Mar. 5, 2019). It also includes challenges to denials of transfer requests on constitutional grounds. *See Wills v. Barnhardt*, No. 21-1383, 2022 WL 4481492, at *2 (10th Cir. Sept. 27, 2022) (rejecting argument that § 3621(b) did not apply to due process and equal protection challenges because "§ 3621(b) contains no such limiting language").

In *Doe*, this Court nonetheless found that § 3621(b) "do[es] not divest the Court of jurisdiction to entertain constitutional claims" because the statute was "not sufficiently explicit to bar consideration" of such claims. 2025 WL 388218, at *2. The Court so concluded based primarily on *Webster v. Doe*, 486 U.S. 592 (1988), where the Supreme Court held that a statute that gave the CIA director "discretion" to terminate employees did not preclude review of constitutional claims. *Id.* at 603. Unlike the statute in *Webster*, however, § 3621(b) not only gives BOP broad discretion to make placement decisions, but also contains an *express* nonreviewability provision that was absent in *Webster*. *See* 18 U.S.C. § 3621(b) (designation decisions are "not reviewable by any court"). Congress easily could have carved out constitutional claims, but it did not do so. Congress thus could not have been clearer that it intended to preclude all judicial review of placement decisions.

The Court's 2013 opinion in *Royer v. BOP*, 933 F. Supp. 2d 170 (D.D.C. 2013), is similarly inapposite. *Royer* concerned a different provision of the Prison Litigation Reform Act—18 U.S.C. § 3625—which provides that APA does not apply to designation decisions under § 3621. The Court held that *§ 3625* was insufficiently clear to preclude judicial review of constitutional claims. 933 F. Supp. 2d at 181–82. But *Royer* did not address the nonreviewability provision at issue here. Nor could it

have, as Congress added that provision in 2018, five years after *Royer* was decided. *See* First Step Act of 2018, Pub. L. 115-391 (Dec. 21, 2018), 132 Stat. 5194. Accordingly, *Royer* does not support the conclusion that the Court has authority to review Plaintiff's challenge to BOP's transfer decision, despite the language in § 3621.

## B.    Plaintiff Has Failed to Exhaust Administrative Remedies

Plaintiff's claims are independently barred because Plaintiff has failed to exhaust available administrative remedies.   The Prison Litigation Reform Act ("PLRA") provides:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in jail, prison, or other correctional facility until such administrative remedies as available are exhausted.

42 U.S.C. § 1997e(a).   The Supreme Court has emphasized "that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court." *Jones v. Bock*, 549 U.S. 199, 211 (2007).   "Not even facially meritorious constitutional claims are exempt, nor are claims that the inmate believes—rightly or wrongly—to be futile." *Doe*, 2025 WL 388218, at *3.   So long as administrative remedies are "available," "a court may not excuse a failure to exhaust" under the PLRA, "even to take [special] circumstances into account." *Ross v. Blake*, 578 U.S. 632, 638–39 (2016).   A procedure is "available" even if it cannot provide "the remedial action an inmate demands"; prison officials need only have "authority to take some action in response to a complaint." *Booth v. Churner*, 532 U.S. 731, 736 (2001).

Exhaustion of administrative remedies "serves two main purposes." *Woodford v. Ngo*, 548 U.S. 81, 89 (2006).   "First, exhaustion protects 'administrative agency authority,' giving an agency "an opportunity to correct its own mistakes with respect to the programs it administers before it is haled into federal court." *Id.* (quoting *McCarthy v. Madigan*, 503 U.S. 140, 145 (1992)).   "Second, exhaustion promotes efficiency." *Id.*   "Even where a controversy survives administrative review,

exhaustion of the administrative procedure may produce a useful record for subsequent judicial consideration." *Id.*

Here, BOP's administrative process is "available" to Plaintiff. BOP's Administrative Remedy Program has four levels: (i) aggrieved individuals must first attempt an informal resolution with unit staff, then (ii) submit an administrative remedy request to the Warden, then (iii) appeal to BOP's Regional Director, and then, (iv) if necessary, appeal to BOP's General Counsel. *See* 28 C.F.R. §§ 542.13-.15. Plaintiff does not claim to have "complete[d] the administrative review process in accordance with the applicable procedural rules." *Jones*, 549 U.S. at 218.

At a minimum, requiring exhaustion here would "produce a useful record for subsequent judicial consideration," *Woodford*, 548 U.S. at 89, as the record is currently undeveloped as to how Plaintiff's medical care will change going forward, if at all, because BOP is still revising its guidance on the medical care at issue here. As for the claim that Plaintiff will likely face sexual assault in the designated male prison, BOP should also be allowed to assess how to mitigate such risks in Plaintiff's case if the existing significant measures are insufficient. *See* Stover Decl. ¶¶ 12–16 (discussing BOP's protocols to ensure inmate safety). Under the PLRA, BOP is entitled to have the first opportunity to assess any challenge to its determinations and to take appropriate actions.

In *Doe*, this Court nonetheless held that the plaintiffs' claims fell within a "narrow exception" to the exhaustion requirement for cases where administrative remedies are not "available." 2025 WL 388218, at *3. Specifically, the Court held that administrative remedies were not "available" because they "operate[] as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id.* (quoting *Ross*, 578 U.S. at 642).

But Plaintiff's claims here do not fit within the narrow "dead end" exception. As the Supreme Court explained in *Ross*, that exception might apply, for example,

where "a prison handbook directs inmates to submit their grievances to a particular administrative office—but in practice that office disclaims the capacity to consider those petitions." 578 U.S. at 643. Or it might apply if prison officials "have apparent authority, but decline ever to exercise it." *Id.* But that is not the case here. To date, Plaintiff has not been denied any medical care, and, in any event, Plaintiff could grieve concerns regarding any such denial under BOP's administrative scheme. And even if BOP's yet-to-be revised guidance on medical care imposes some limits on what medical care Plaintiff will receive, prison officials would still have the authority to take "some action" in response to the complaint, *Booth*, 532 U.S. at 736, by, for example, prescribing a possible alternative treatment to treat Plaintiff's health concerns. Indeed, the Executive Order directs BOP to implement the Executive Order in a manner consistent with applicable law, including the Eighth Amendment. To the extent Plaintiff believes that medically necessary care might be withheld in a manner that violates the Eighth Amendment, BOP should in the first instance assess the question of appropriate medical care.

Plaintiff likewise would also be able to grieve any safety concerns associated with transfer. Prison officials would then have an opportunity to take "some action" in response, by, for example, taking additional steps to ensure Plaintiff's safety, including transferring Plaintiff to a different men's facility. While prison officials would lack discretion to transfer Plaintiff back to a women's facility, the proper standard is not whether BOP can give Plaintiff exactly the remedy Plaintiff seeks.

Plaintiff's claims are thus unlike the claims at issue in *Kaemmerling v. Lappin*, 553 F.3d 669 (D.C. Cir. 2008), which this Court cited in *Doe*. In *Kaemmerling*, BOP "could not articulate a single possible way the prison's administrative system could provide relief or take any action at all in response to Kammerling's claim that collecting his DNA would violate his statutory and constitutional rights." 553 F.3d at 675–76. The prison grievance process therefore could not authorize *any* action on

14

Kaemmerling's complaint. *Id.* Here, by contrast, prison officials could take *some action* in response to a complaint about safety concerns or medical care. While that action may not be "the remedial action [Plaintiff] demands," again that is not required for remedies to be considered "available" under the PLRA. *Booth*, 532 U.S. at 736. Accordingly, Plaintiff must comply with the PLRA's exhaustion requirement.

## II.    PLAINTIFF HAS NOT DEMONSTRATED A LIKELIHOOD OF SUCCESS ON THE MERITS

### A.    Plaintiff Is Unlikely to Succeed on The Equal Protection Claim

Plaintiff is also unlikely to succeed on the merits. Plaintiff first argues that BOP's implementation of Sections 4(a) and 4(c) of the Executive Order violates equal protection. The Fourteenth Amendment's Equal Protection guarantee, as applied to the Federal Government through the Due Process Clause of the Fifth Amendment, *Bolling v. Sharpe,* 347 U.S. 497, 499 (1954), "requires the government to treat similarly situated persons alike," *Women Prisoners*, 93 F.3d at 924 (citing *City of Cleburne v. Cleburne Living Ctr., Inc.,* 473 U.S. 432, 439 (1985)). "The Constitution, however, 'does not require things which are different in fact or opinion to be treated in law as though they were the same.'" *Id.* (quoting *Plyler v. Doe,* 457 U.S. 202, 216 (1982)); *accord Michael M. v. Superior Court,* 450 U.S. 464, 469 (1981). "Thus, the dissimilar treatment of dissimilarly situated persons does not violate equal protection." *Women Prisoners*, 93 F.3d at 924 (citation omitted).

For example, the D.C. Circuit in *Women Prisoners* held that prison administrators' failure to provide women inmates the same programs as those available in men's facilities did not violate equal protection because the female and male inmates in the D.C. prison system were not similarly situated for a variety of reasons. Citing *Turner v. Safley*, 482 U.S. 78, 85–85, 89 (1987), which generally governs the standard for analyzing alleged unconstitutional prison practices, the D.C. Circuit observed that to require prison officials to do otherwise would "completely

15

eviscerate[] the deference that federal courts are obliged to give prison administrators." *Women Prisoners*, 93 F.3d at 926–27.

Under *Turner*'s deferential standard, courts "are to uphold prison regulations that 'impinge on inmates' constitutional rights' as long as those regulations are 'reasonably related to legitimate penological interests.'" *Hatim v. Obama*, 760 F.3d 54, 58 (D.C. Cir. 2014) (quoting *Turner*, 482 U.S. at 84–85, 89). In *Turner*, the Court held that prison regulations restricting inmate marriages and inmate-to-inmate correspondence were not subject to strict scrutiny despite the implication of fundamental rights. As the Court recognized, a "deferential" standard is "necessary if 'prison administrators, and not the courts, are to make the difficult judgments concerning institutional operations.'" *Turner*, 482 U.S. at 88 (alterations omitted) (quoting *Jones v. North Carolina Prisoners' Union*, 433 U.S. 119, 128 (1977)); *see also Rhodes v. Chapman*, 452 U.S. 337, 351 n.16 (1981) (prison administration is "peculiarly within the province of the legislative and executive branches of government"); *Bell v. Wolfish*, 441 U.S. 520, 548 (1979) ("[T]he operation of our correctional facilities is peculiarly the province of the Legislative and Executive Branches of our Government, not the Judicial."); *Preiser v. Rodriguez*, 411 U.S. 475, 491–92 (1973) ("It is difficult to imagine an activity in which [the government] has a stronger interest, or one that is more intricately bound up with state laws, regulations, and procedures, than the administration of its prisons."). Thus, courts "must accord prison administrators wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Hatim*, 760 F.3d at 59 (cleaned up).

1.      **Section 4(a) does not violate equal protection**

(a)      **Section 4(a) satisfies *Turner*'s deferential standard.**

Applying the above principles here, Plaintiff is unlikely to succeed in establishing an Equal Protection violation.  As to BOP's application of Section 4(a) ("Privacy in Intimate Spaces") of the Executive Order, Plaintiff cannot demonstrate that Plaintiff is entitled to the same housing as biological female inmates.  As the D.C. Circuit has recognized, "the segregation of inmates by sex is unquestionably constitutional." *Women Prisoners*, 93 F.3d at 926.  Male and female inmates are not similarly situated, and thus, treating them differently does not violate equal protection.  *Id.* at 924 ("[The dissimilar treatment of dissimilarly situated persons does not violate equal protection.").  That is especially true with respect to intimate areas, such as living spaces.  *See Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 804 (11th Cir. 2022) (en banc) (recognizing the "generally acceptable notion that the protection of individual privacy will occasionally require some segregation between the sexes is beyond doubt").

Even if Plaintiff were considered similarly situated to a biological female inmate, Plaintiff's Equal Protection challenge would still fail.  Equal Protection does not require BOP to recognize exceptions to a plainly constitutional classification. Indeed, under the comparable rational-basis review, a classification does not fail simply because it "is not made with mathematical nicety or because in practice it results in some inequality." *Dandridge v. Williams*, 397 U.S. 471, 485 (1970).  Rather, legislative classifications may be "both underinclusive and overinclusive" and "perfection is by no means required." *Vance v. Bradley*, 440 U.S. 93, 108 (1979); *see also Heller v. Doe*, 509 U.S. 312, 321 (1993) (under rational-basis review, a classification does not violate equal protection "even when there is an imperfect fit between means and ends"); *Steffan v. Perry*, 41 F.3d 677, 687 (D.C. Cir. 1994) (same).  This is so because the task of classifying persons "inevitably requires that some persons who

17

have an almost equally strong claim to favored treatment be placed on different sides of the line." *Fitzgerald v. Racking Ass'n of Central Iowa*, 539 U.S. 130, 108 (2003) (quotation marks omitted).

The policy of housing inmates according to their biological sex readily withstands scrutiny under *Turner*'s deferential standard because the Executive has a legitimate penological interest in protecting the safety, well-being, and dignity of women inmates, who could have privacy and security concerns about being housed with individuals of the opposite biological sex. The Executive has determined that it is better for prison management and security to treat all biological male inmates similarly by housing them in men's facilities, which in turn would also protect women inmates' safety and privacy concerns in intimate spaces. *See Hatim*, 760 F.3d at 59 ("Prison security . . . is beyond cavil a legitimate governmental interest."). BOP's implementation of Section 4(a) has a rational connection to furthering these interests. While the government previously chose to accommodate Plaintiff by housing the inmate in a women's facility, "a change in administration brought about by the people casting their votes is a perfectly reasonable basis for an executive agency's reappraisal of the costs and benefits of its programs and regulations." *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 59 (1983) (Rehnquist, J., concurring in part, dissenting in part). The Court accordingly should defer to the Executive's reasonable judgment.

Plaintiff contends that Section 4(a) "fail[s] even rational basis review" because it is "based on animus toward transgender people." Pl.'s Mem. at 13. However, unlike in the "few occasions" where the Court has struck down a policy on animus grounds, here "it cannot be said that it is impossible to discern a relationship to legitimate state interests or that the policy is inexplicable by anything but animus," *Trump v. Hawaii*, 585 U.S. 667, 706 (2018), as demonstrated above. Indeed, a bare desire to harm an unpopular group is inferred only when the government cannot point to any

legitimate government interest to justify the challenged classification, *see, e.g.*, *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 450, (1985), which is not the case here. Section 4(a)'s requirement that all biological male inmates be placed in men's facilities is supported by the legitimate penological interests discussed above and is premised upon "basic biological differences" between men and women. *Tuan Anh Nguyen v. I.N.S.*, 533 U.S. 53, 73 (2001).

*Johnson v. California*, 543 U.S. 499 (2005), does not support Plaintiff's argument that heightened scrutiny applies here. *Johnson* concerned a classification by race, not a classification by sex. While *Johnson* cabined *Turner*'s deferential standard as to *racial* classifications, this Court properly recognized in *Doe* that "[t]here is good reason to doubt that *Johnson*'s cabining of *Turner* applies to laws that discriminate among inmates on the basis of sex." 2025 WL 388218, at *4. As the Court explained:

> *Johnson* stressed that "[t]he right not to be discriminated against based on one's race is not susceptible to the logic of *Turner*" because that right need not "be compromised for the sake of proper prison administration." [543 U.S. at 510.] By contrast, "the segregation of inmates by sex is unquestionably constitutional" because it is reasonably related to legitimate prison management concerns." [*Women Prisoners*, 93 F.3d at 926.]

2025388218, at *4.

**(b)    Section 4(a) does not discriminate based on sex.**

Plaintiff cites the Supreme Court's Title VII-specific conclusion in *Bostock v. Clayton County*, 590 U.S. 644 (2020), in arguing that placing biological male inmates who identify as female in men's facilities constitutes sex discrimination. In *Bostock*, the Supreme Court reasoned that Title VII's prohibition on sex discrimination incorporated a but-for causation standard and held that when an employer fires an employee because that employee is gay or transgender, sex is necessarily a but-for cause of such discrimination. 590 U.S. at 656, 668-69, 683.

19

*Bostock* is inapposite. As an initial matter, *Bostock* proceeds from the premise that an employer discriminates against a person because of sex where the employer "treat[s] that individual worse than others who are similarly situated." *Bostock*, 590 U.S. at 657. But, as discussed above, biological men and biological women are not similarly situated with respect to their appropriate housing during a period of incarceration. Thus, the decision to segregate biological males and biological females when housing inmates is not discrimination.

Moreover, the Supreme Court's conclusion in *Bostock* was derived entirely from Title VII's "plain terms," *id.* at 676, which provide, in relevant part, that it is unlawful for an employer "to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex," 42 U.S.C. § 2000e-2(a)(1). The text of the Equal Protection Clause does not contain any similar language. For that reason, courts have recognized that Title VII and the Equal Protection Clause have different purposes and different functions. *See, e.g.*, *L. W. by & through Williams v. Skrmetti*, 83 F.4th 460, 484-85 (6th Cir.) (discussing the "[d]ifferences between the language of the statute and the Constitution" along with the distinct principles at play in the Equal Protection Clause and Title VII), *cert. granted sub nom. United States v. Skrmetti*, 144 S. Ct. 2679 (June 24, 2024). Disparate impact claims, for example, are available under Title VII, *see Griggs v. Duke Power Co.*, 401 U.S. 424, 429–30 (1971), but not under the Fourteenth Amendment, *see Washington v. Davis*, 426 U.S. 229, 238–39 (1976).

Tellingly, the Supreme Court in *Bostock* rejected the employer's argument in that to isolate sex, the Court had to keep all other variables constant. 590 U.S. at 671. The Court reasoned that "[t]he employers might be onto something if Title VII only ensured equal treatment between groups of men and women." *Id.* Equal treatment, of course, is the Equal Protection analysis here. Lest there be any doubt,

"the Court in *Bostock* was clear on the narrow reach of its decision and how it was limited only to Title VII itself." *Pelcha v. MW Bancorp, Inc.*, 988 F.3d 318, 324 (6th Cir. 2021); *see also Bostock*, 590 U.S. at 681 (rejecting concern that the Court's decision would "sweep beyond Title VII to other federal or state laws that prohibit sex discrimination"). *Bostock*'s Title VII-specific analysis is thus inapplicable here.

> **(c)    Individuals who identify with the opposite biological sex do not constitute a quai-suspect class.**

Plaintiff also contend that the classification warrants intermediate scrutiny because in Plaintiff's view, individuals who identify with the opposite biological sex constitute a constitutionally protected class. *See* Pl.'s Mem. at 9–10. But the Supreme Court has never "recognized transgender status as a suspect class." *Skrmetti*, 83 F.4th at 486. Nor has it recognized any new constitutionally protected class in almost half a century. *See Craig v. Boren,* 429 U.S. 190 (1976) (sex constitutes quasi-suspect class). Instead, it has repeatedly declined to do so. *See City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 442 (1985) (mental disability); *Mass. Bd. of Ret. v. Murgia*, 427 U.S. 307, 313–14 (1976) (age); *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 28–29 (1973) (poverty); *see also Obergefell v. Hodges*, 576 U.S. 644 (2015) (declining to address whether gay people qualify as quasi-suspect class).

Transgender status in any event does not give rise to a constitutionally protected class when considering the factors the Supreme Court has used to make such determinations: a "discrete group" defined by "immutable" characteristics that is "politically powerless" and has suffered a history of discriminatory treatment. *See Lying*, 477 U.S. at 638 (citing *Murgia*, 427 U.S. at 313–14). Individuals who identify with the opposite biological sex do not "exhibit obvious, immutable, or distinguishing characteristics that define them as a discrete group." *Bowen v. Gilliard*, 483 U.S. 587, 602 (1987). Their gender identification is not "necessarily immutable, as the stories of 'detransitioners' indicate." *Skrmetti*, 83 F.4th at 487. Further, the

transgender status is not characterized by a specific defining feature, but instead may be said to include "a huge variety of gender identities and expressions." *Id.* at 487; *see also* Br. of American Psychological Association as *Amicus Curiae* at 6 n.7, *United States v. Skrmetti*, No. 23-477 (U.S.) (stating that "transgender" is an "umbrella term" that covers "varied groups" and "many diverse gender experiences").

Moreover, individuals who identify with an opposite biological sex are not "political[ly] powerless[]" either. *San Antonio Independent Sch. Dist. v. Rodriguez*, 411 U.S. 1, 28 (1973). "A national anti-discrimination law, Title VII, protects transgender individuals in the employment setting," and many "States have passed laws specifically allowing some of the treatments sought here." *Skrmetti*, 83 F.4th at 487. It is therefore untenable to claim that transgender persons "have no ability to attract the attention of lawmakers." *Cleburne*, 473 U.S. at 445. The mere fact that they may not be able to "themselves mandate the desired legislative responses," and that they may "claim some degree of prejudice from at least part of the public at large," is insufficient. *Id.* Similarly, claims of historical injustice are not sufficient to establish a quasi-suspect class: the Supreme Court in *Cleburne* "rejected the argument that mental disability is a suspect classification, despite a history of compulsory sterilization, exclusion from public schools, and a system of 'state-mandated segregation and degradation.'" *Eknes-Tucker v. Governor of Alabama* ("*Eknes-Tucker II*"), 114 F.4th 1241, 1266 (11th Cir. 2024) (Lagoa, J., concurring) (quoting *Cleburne*, 473 U.S. at 462–63 (Marshall, J., concurring in the judgment and dissenting in part)).

In sum, because Plaintiff does not belong to a constitutionally protected class, heightened scrutiny does not apply.

**(d)    Section 4(c) would survive even heightened scrutiny.**

Even if the *Turner* standard does not apply and BOP's application of Section 4(a) is reviewed under heightened scrutiny, it would survive heightened scrutiny as

22

well.  "Heightened scrutiny does not eliminate appreciation of both the difficulties confronting prison administrators and the considerable limits of judicial competency, informed by basic principles of separation of powers."  *Pitts v. Thornburgh*, 866 F.2d1450, 1455 (1989) (rejecting equal protection sex-discrimination challenge under heightened scrutiny).  Heightened scrutiny "must not substitute the court's presumed expertise for that of prison administrators as the court evaluates administrator's choices of one course over others."  *Id.*; *see also Harrison v. Kernan*, 971 F.3d 1069, 1079 (9th Cir. 2020) ("Under heightened scrutiny, the deference owed to judgments made by prison officials is factored into the importance of the government's asserted interest.").

Here, the government has "specifically asserted the governmental interest that supports the contested policies," *Pitts*, 866 F.2d at 1456—*i.e.*, the safety, well-being, and privacy of inmates in intimate spaces.  And Section 4(a) of the Executive order is "directly and substantially related" to that important government interest.  *Id.* Accordingly, Section 4(a) would survive even heightened scrutiny.

## 2.    Section 4(c) does not violate equal protection

As for Section 4(c), Plaintiff's equal protection challenge to its implementation is premature.  Section 4(c) requires BOP to "revise[] its policies concerning medical care to be consistent with this order."  Although it further provides that BOP shall ensure that "no Federal Funds are expended for any medical procedures, treatment, or drug for the purpose of conforming an inmate's appearance to that of the opposite sex," BOP has not yet revised its guidance to implement that provision, nor has it explained what medical care might fall within that prohibition.  Thus, it remains unclear whether Plaintiff will be deprived of any treatment for her gender dysphoria. Thus, Plaintiff's claims challenging the discontinuation of medical care are unripe.

"[A] case is unripe for review when any prediction how the Government might eventually implement a policy is no more than conjecture."  *Saline Parents v.*

23

*Garland*, 88 F.4th 298, 308 (D.C. Cir. 2023) (alterations and quotation marks omitted), *cert. denied*, No. 23-1135, 2024 WL 4426566 (U.S. Oct. 7, 2024). "Absent a concrete factual context, determination of the scope and constitutionality of a purported government policy in advance of its immediate adverse effect involves too remote and abstract an inquiry for the proper exercise of the judicial function." *Id.* at 307 (alteration and quotation marks omitted). Because the medical care guidance at issue has not yet been developed or applied, Plaintiff's challenge to that guidance "rests on hypotheticals that are too remote, speculative, and abstract for judicial review." *Id.* at 308. The Court therefore should not offer an advisory opinion. *Abbott Labs. v. Gardner*, 387 U.S. 136, 148 (1967) (courts should not "entangl[e] themselves in abstract disagreements" by engaging in "premature adjudication"). Instead, this Court should presume, in accordance with the Executive Order's text, that the yet-to-be formulated guidance will be implemented in a manner consistent with the Constitution, including the provision of constitutionally minimum adequate medical care under the Eighth Amendment. *See* Exec. Order 14168, § 8(b).

Even if Plaintiff's claim were ripe, Section 4(c) does not violate Equal Protection. That section does not classify individuals based on sex or any other constitutionally protected status, and thus, it would be subject only to rational basis review. Section 4(c) easily satisfies rational basis review because there is a legitimate government interest in not using Federal funds to change an inmate's appearance. *See, e.g.*, *Windsor v. United States*, 699 F.3d 169, 186 (2d Cir. 2012) ("Fiscal prudence is undoubtedly an important government interest."), *aff'd*, 570 U.S. 744 (2013). Importantly, Plaintiff has not shown that BOP will deny Plaintiff medically necessary care that it provides to inmates who do not identify with the opposite biological sex, especially considering that BOP has not yet revised its guidance on medical care.

24

### B.  Plaintiff Is Unlikely to Succeed on the Eighth Amendment Claim

Plaintiff likewise is unlikely to succeed on the Eighth Amendment claim. Plaintiff contends that BOP has acted with deliberate indifference to Plaintiff's safety and medical needs in two ways: (1) by "failing to protect [Plaintiffs] from a serious risk of bodily harm" because Plaintiff will be transferred to men's facilities, and (2) by adopting a "blanket ban on gender dysphoria treatment."  Pl.'s Mem. at 14–16. Neither argument justifies the issuance of emergency relief.

### 1.    Plaintiff is not likely to succeed on a "failure to protect" claim

Plaintiff is unlikely to establish that BOP has "recklessly disregarded" an "excessive risk" to Plaintiff's safety by transferring Plaintiff to a men's facility. *Bernier v. Allen*, 38 F.4th 1145, 1151 (D.C. Cir. 2022).  The Eighth Amendment's prohibition against "cruel and unusual punishments" is meant to prohibit "unnecessary and wanton infliction of pain," which is "repugnant to the conscience of mankind."  *Estelle v. Gamble*, 429 U.S. 97, 103 (1976).  As the D.C. Circuit has recognized, "the 'deprivations' that trigger Eighth Amendment scrutiny are deprivations of essential human needs."  *Inmates of Occoquan v. Barry,* 844 F.2d 828, 836 (D.C. Cir. 1988); *accord Women Prisoners*, 93 F.3d at 928.  An inmate thus can establish an Eighth Amendment claim only if he can show "a prison official knew that he faced a substantial risk of serious harm but disregarded that risk by failing to take reasonable measures."  *Stoddard v. District of Columbia*, 764 F. Supp. 2d 213, 218 (D.D.C. 2011) (citing *Farmer v. Brennan,* 511 U.S. 825, 847 (1994)).  The "wanton disregard" to a prisoner's needs "must be akin to criminal recklessness."  *Kosilek v. Spencer*, 774 F.3d 63, 83 (1st Cir. 2014) (en banc)).

Plaintiff cannot make that showing here.  Plaintiff cannot show that housing a biological male who identifies as a woman in a men's facility is "repugnant to the conscience of mankind," *Estelle*, 429 U.S. at 103, especially given the practical reality

that nearly all (99%) of biological male prisoners who identify as female are housed in men's facilities. *See* Stover Decl. ¶ 5.

Plaintiff nonetheless suggests (incorrectly) that "[c]ourts have consistently found" an Eighth Amendment violation "when officials knowingly house transgender women in men's prisons." Pl.'s Mem. at 17. But none of the cases Plaintiff cites stands for that broad proposition. Rather, the cases Plaintiff cites involve allegations that prison guards disregarded some *particularized* risk of harm to a transgender inmate that resulted in actual violence. For example, in *Doe v. District of Columbia*, prison guards had locked the plaintiff in a cell alone with a man who was alleged to have raped other inmates, notwithstanding instructions that the plaintiff be "housed alone." 215 F. Supp. 3d at 64. The guards then failed to check on the plaintiff overnight, and the plaintiff was raped. *Id.* On those facts, the court denied the defendant's motion for summary judgment, holding that a reasonable jury could conclude the prison guards "knew they were placing [the plaintiff] at substantial risk of being raped." *Id.* at 77; *see also Lojan v. Crumbsie*, No. 12 CV. 0320 LAP, 2013 WL 411356, at *4 (S.D.N.Y. Feb. 1, 2013) (denying motion for summary judgment where prison officials allowed prison trustee access to plaintiff, notwithstanding the trustee's gang affiliation and history of violence).

Here, by contrast, Plaintiff contends that housing her in any men's facility by itself constitutes cruel and unusual punishment because transgender inmates have an increased risk of victimization. *See* Pl.'s Mem. at 17. But there is no authority or limiting principle for the proposition that transgender inmates must be placed in a facility consistent with their identified sex because of this generalized risk. More importantly, there is no evidence suggesting that transferring Plaintiff to the low-security facility BOP has identified would substantially increase any risk of harm to Plaintiff. Indeed, the rate of violence at Plaintiff's current women's facility is higher than the rate of violence at the men's facility where Plaintiff would be transferred.

*See* Stover Decl. ¶ 9. In 2024, the women's facility in which Plaintiff is currently housed had a total of ██ guilty findings of assaults on inmates (or ██% of the population), whereas the men's facility to which Plaintiff would be transferred had a total of ██ guilty findings of assault (or ██% of the population). *Id.*

Rather than focusing on the facility to which Plaintiff will be transferred, Plaintiff cites general statistics concerning inmates who identify with the opposite biological sex in all "state and federal prisons" from 2007 to 2012. Pl.'s Mem. at 5. The statistical report on which plaintiff relies itself undermines Plaintiff's contention that Plaintiff's transfer to the identified male facility will necessarily increase the risk of harm. The report indicates, for example, that the rate of sexual victimization is almost two-and-a-half times *higher* at female prisons (8.5%) than at male prisons (3.7%). *See* DOJ Off. of Justice Programs, *Sexual Victimization in Prisons and Jails Reported By Inmates, 2011-12* –at 15 (Table 5).[1] Even more significantly, the report identifies many male facilities in the federal prison system that have very low rates of sexual victimization, *see id.* at 48 (Appendix Table 1), including a number of facilities that "had no reported incidents of sexual victimization of any kind" when surveyed, *id.* at 15. In addition, more recent data shows that the rate of sexual victimization is generally much lower in federal prisons than in state prisons. For example, data from the Bureau of Justice Statistics shows that in 2019, rates of sexual victimization were nearly three times higher in state prisons than in federal prisons (20.6% rate in state prisons vs. 7.4% rate in federal prisons). *See* DOJ Off. of Justice Programs, *Sexual Victimization Reported by Adult Correctional Authorities, 2019-20 – Statistical Tables* at 8 (Table 1).[2] And these statistics concern *all* federal prisons—not the particular *low*-security facility to which Plaintiff will be transferred.

---

[1] Available at https://bjs.ojp.gov/content/pub/pdf/svpjri1112.pdf
[2] Available at https://bjs.ojp.gov/document/svraca1920st.pdf.

For similar reasons, Plaintiff's reference to BOP regulations governing the screening of inmates for risk of victimization and abuse is unavailing. *See* Compl. ¶ 50 (citing 28 C.F.R. §§ 115.41(d)(7), 115.42). Like the statistical reports Plaintiff cites, those regulations recognize that inmates who identify with the opposite biological sex are, as a general matter, at higher risk of sexual victimization than other inmates. But they do not adopt the position that the placement of a biological male who identifies as female in a male prison will necessarily increase the risk of harm to that inmate. The regulations instead require officials to take an individual's identified sex into account in deciding the facility to which that individual should be assigned.

Moreover, BOP has provided a declaration explaining that, in making the housing determination, it has considered Plaintiff's medical and psychology record, as well as the potential risk of sexual assault and the characteristics of the male facility to which Plaintiff will be transferred. *See* Stover Decl. ¶¶ 7–10. BOP intends to minimize the risk of harm to Plaintiff by placing Plaintiff in a low security institution with many non-violent offenders. *Id.* ¶ 8. Those actions do not represent a "disregard" of a substantial a risk of harm; they represent "reasonable measures" to respond to it. *Stoddard*, 764 F. Supp. 2d at 218.

The Court in *Doe* nonetheless concluded that based on the limited record before it, the plaintiffs there had demonstrated "a sufficient likelihood of success to justify" preliminary relief as to their Eighth Amendment claim. 2025 WL 388218, at *4. To support that conclusion, the Court relied on two allegations in the plaintiffs' complaint: (i) that persons who identify with the opposite biological sex generally are at elevated risk of physical and sexual violence relative to other inmates when housed in a facility corresponding to their biological sex, and (ii) that placement in a male penitentiary by itself will exacerbate the plaintiffs' symptoms of gender dysphoria.

28

*Id.* at *5 (citing Compl. ¶¶ 5, 44). But neither allegation supports the conclusion that housing Plaintiff in a men's facility would constitute cruel and unusual punishment.

As to the first point, Plaintiff's argument about the general risks that persons who identify with the opposite biological sex face proves too much, as it would suggest that all transgender prisoners housed according to their biological sex have a viable Eighth Amendment claim. That cannot be correct. And as explained, it ignores the facts that BOP has taken steps to minimize risks to Plaintiff by selecting an appropriate low-security facility with a large number of non-violent offenders, and that there are significant security protocols in place to address sexual assault and harassment. *See* Stover Decl. ¶¶ 7–9. Thus, contrary to the Court's suggestion in *Doe*, Defendants *do* dispute that transferring Plaintiff (or the *Doe* plaintiffs) to the specified low-security male facilities "would substantially increase the likelihood of them experiencing [a] parade of harms." 2025 WL 388218, at *5. There is no evidence in the record supporting such allegations.

As to the second point, Plaintiff has offered no evidence supporting the allegation that placement in a male facility will itself exacerbate symptoms of gender dysphoria, let alone that it would cause the type of serious psychological harm necessary to establish an Eighth Amendment violation. Plaintiff's expert's declaration does not state that being housed in a women's facility is medically necessary. *See* Meade Decl., ECF No. 21-4. Nor does Plaintiff cite any case law supporting that proposition. There are 2,198 prisoners in BOP custody who identify with the opposite biological sex, and only a handful of them are housed in facilities corresponding to their identified sex. It is well settled that the Eighth Amendment does not require that the care provided to prisoners be "perfect, the best obtainable, or even very good." *Keohane v. Fla. Dep't of Corr. Sec'y*, 952 F.3d 1257, 1266 (11th Cir. 2020). Nor does it require prison officials to provide inmates with their preferred care or the care that would be most "psychologically pleasing" to them. *Id.* at 1273.

29

While the government previously decided to house Plaintiff in a female facility, the decision to no longer do so is not an Eighth Amendment violation.

>    **2.    Plaintiff is unlikely to succeed on a claim regarding medical care**

Plaintiff's Eighth Amendment challenge for denial of medical care is premised on the assumption that Plaintiff will be deprived hormone therapy. But that challenge is premature because as discussed above, BOP is revising its guidance on medical care. *See* Exec. Order, §§ 4(c), 8(b). Notably, the Eighth Amendment "proscribes only medical care so unconscionable as to fall below society's minimum standards of decency." *Kosilek*, 774 F.3d at 96; *see also Lamb v. Norwood*, 899 F.3d 1159, 1162 (10th Cir. 2018) ("prison officials do not act with deliberate indifference when they provide medical treatment even if it is subpar or different from what the inmate wants"). Only "[d]eliberate indifference to serious medical needs of prisoners" can constitute an Eighth Amendment violation. *Erickson v. Pardus*, 551 U.S. 89, 90 (2007). And a prisoner must satisfy both: (1) an objective prong that requires proof of a serious medical need, and (2) a subjective prong that mandates a showing of prison administrators' deliberate indifference to that need. *Bernier*, 38 F.4th at 1151.

The Court cannot assume that BOP's application of the yet-to-be formulated guidance on the medical care at issue will violate the Eighth Amendment or that Plaintiff is likely to meet the above stringent standard as to warrant emergency relief now. *Cf.* Order Denying Mot. for Prelim. Inj., *Keohane v. Dixon*, 4:24-cv-00434, (N.D. Fla, Dec. 27, 2024) (ECF No. 55) (suit challenging state correctional department's reevaluation of policies concerning hormone treatment for biologically male inmates where new state law prohibits "expending any state funds to purchase cross-sex hormones for the treatment of Gender Dysphoria"; preliminary injunction motion denied because the correctional department indicated that it would provide "constitutionally adequate care").

That is especially so because there is an ongoing debate in the medical community over the necessity or efficacy of certain treatments for gender dysphoria. That is one of the central issues in *United States v. Skrmetti*, No. 23-477, currently pending before the Supreme Court.  As discussed at oral argument in that case, a recent comprehensive report in the United Kingdom found that while deaths by suicide in individuals who identify with the opposite biological sex are tragically above the national average, there is "no evidence that gender-affirmative treatments reduce this." *Independent Review of Gender Identity Services for Children and Young People:  Final Report* at 195 (April 2024), *available at* https://cass.independent-review.uk/home/publications/final-report/.    Indeed, "emerging gender dysphoria treatments"—such as "cross-sex hormones, and gender reassignment surgery—are matters of significant scientific debate and uncertainty." *Kadel v. Folwell*, 100 F.4th 122, 193 (4th Cir. 2024) (Wilkinson, J., dissenting); *see Edmo v. Corizon, Inc.*, 949 F.3d 489, 490 (9th Cir. 2020) (O'Scannlain, J., dissenting) (calling treatment for gender dysphoria "a new, rapidly changing, and highly controversial area of medical practice").  And "various circuits . . . have rejected Eighth Amendment claims for hormone therapy . . . to treat gender dysphoria, at least in individual cases." *Gibson v. Collier*, 920 F.3d 212, 223 n.8 (collecting cases).

In concluding that the *Doe* plaintiffs had nevertheless established a likelihood of success on the limited TRO record in *Doe*, the Court relied on a declaration from a physician explaining the symptoms that may arise from failure to treat gender dysphoria.  *Doe*, 2025 WL 388218, at *5.  Plaintiff has provided a similar declaration in this case.  *See* Declaration of Lauren Meade, M.D. ECF No. 21-4.  But there is nothing in the record at this stage suggesting that BOP will "fail[] to treat" gender dysphoria.  *Id.*  While the Executive Order prohibits expending Federal funds for certain treatments whose purpose is to "conform an inmate's appearance to that of the opposite sex," that by itself says nothing about whether BOP would stop treating

31

gender dysphoria.  Accordingly, contrary to the Court's suggestion in *Doe*, Defendants do dispute that Plaintiff likely will suffer the symptoms that Plaintiff's expert describes, especially given that it is unknown at this time how BOP will revise its guidance on the treatment of gender dysphoria.

### C.    Plaintiff Is Unlikely to Succeed on the APA Claim

Plaintiff's APA claim is unlikely to succeed because, as a threshold matter, the PLRA prohibits a prisoner from challenging his or her "place of imprisonment" under the APA.  The PLRA provides that the APA "do[es] not apply to the making of any determination, decision, or order under [Title 18, Part II, Chapter 229, Subchapter C]."  18 U.S.C. § 3625.  Subchapter C includes 18 U.S.C. § 3621(b), which governs the "place of imprisonment."  The Court accordingly recognized in *Doe* that Defendants "may be correct that these statutory provisions foreclose any APA challenges to facility designations and transfer decisions."  2025 WL 388218, at *2.

BOP also has not taken any "final agency action" as to Plaintiff's medical care; yet, under the APA, "judicial review is available only for 'final agency action.'"  *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.,* 603 U.S. 799, 808 (2024) (citing 5 U.S.C. § 704).  Plaintiff acknowledges that "Executive orders issued by the President are not subject to the APA," but suggests that "an agency's action implementing such an order may be the basis of an APA claim."  Pl.'s Mem. at 18.  But at least as to medical care, Plaintiff has not identified an action that "mark[s] the consummation of the agency's decisionmaking process" and is "one by which rights or obligations have been determined, or from which legal consequences will flow."  *Bennett v. Spear*, 520 U.S. 154, 177–178 (1997)  (internal quotation marks omitted).  As noted, BOP has not revised its policies concerning medical care.  Nor has it altered Plaintiff's medical treatment.

Even assuming Plaintiff can overcome these significant threshold hurdles, Plaintiff's APA claim is not likely to succeed.  Plaintiff first contends that BOP's

transfer decision was made "without observance of procedure required by law" because BOP "did not amend 28 C.F.R. §§ 115.41–42 through notice-and-comment rulemaking before deciding to transfer." Pl.'s Mem. at 19. The cited PREA regulations, however, merely require BOP to consider Plaintiff's gender identification when deciding on the facility to house Plaintiff. Transferring Plaintiff to a men's facility therefore does not violate the PREA regulations. *See id.* at 21.

As discussed above, the PREA regulations are designed to achieve "the goal of keeping separate those inmates at high risk of being sexually victimized from those at high risk of being sexually abusive." 28 C.F.R. § 115.42(a). To that end, § 115.42(c) provides:

> In deciding whether to assign a transgender or intersex inmate to a facility for male or female inmates, and in making other housing and programming assignments, the agency shall consider on a case-by-case basis whether a placement would ensure the inmate's health and safety, and whether the placement would present management or security problems.

The regulations also require prison officials to give "serious consideration" to "[a] transgender or intersex inmate's own views with respect to his or her own safety." *Id.* § 115.42(e). But there is no requirement that an inmate be placed in a facility that is consistent with the inmate's preferred gender. While BOP has permitted that option in the past, the regulation merely requires BOP to conduct a case-by-case assessment as to the proper placement of each inmate, *id.* § 115.42(c), considering a range of factors identified in the regulations, *id.* § 115.41(d), which BOP has done, *see* Stover Decl. ¶ 7.

Finally, Plaintiff contends that BOP's action is arbitrary and capricious because it "fails to consider important aspects of the problem," "depart[s] from agency precedent without explanation," and "relies on pretextual or contrived reasons." Pls' Mem. at 19. But "[a]gencies are free to change their existing policies as long as they

provide a reasoned explanation for the change." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221–22 (2016). As noted, over time BOP has changed its policies concerning inmates who identify with the opposite biological sex. The Supreme Court has made clear that agency action is not subject to a heightened or more searching standard of review simply because it represents a change in policy. *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 514–15 (2009). Rather, the core requirement is simply that the agency "display awareness that it *is* changing position." *Id.* at 515; *see also Nat'l Ass'n of Home Builders v. EPA*, 682 F.3d 1032, 1037 (D.C. Cir. 2012) ("[A]n agency's view of what is in the public interest may change, either with or without a change in circumstances."). The Executive Order has articulated why the Executive has changed its policy. Plaintiff's disagreement with the new policy is insufficient to show that the policy is arbitrary and capricious, let alone warranting emergency injunctive relief.

## III.    PLAINTIFF HAS NOT DEMONSTRATED IRREPARABLE HARM

Not only is Plaintiff unlikely to succeed on the merits, but Plaintiff has also failed to "demonstrate irreparable harm," which is "grounds for refusing to issue a preliminary injunction, even if the other three factors . . . merit such relief." *Nat'l Mining Ass'n v. Jackson*, 768 F. Supp. 2d 34, 50 (D.D.C. 2011) (quoting *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006)). "In this Circuit, a litigant seeking a preliminary injunction must satisfy 'a high standard' for irreparable injury." *ConverDyn v. Moniz*, 68 F. Supp. 3d 34, 46 (D.D.C. 2014) (quoting *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297). Plaintiffs must demonstrate that they face an injury that is "both certain and great; it must be actual and not theoretical." *Wis. Gas. Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985).

Here, Plaintiff has not demonstrated a likelihood of irreparable harm, largely for reasons already discussed. Plaintiff has not shown that Section 4(c) of the Order will result in irreparable harm because BOP has not yet revised its policies

concerning medical care, and so it is not yet clear how, if it all, the revised policies will affect Plaintiff's medical care.  Nor has Plaintiff demonstrated that the upcoming transfer to a men's facility will result in physical harm, given that most biological male inmates who identify as female are currently housed in male facilities and that BOP intends to minimize any risk to Plaintiff by transferring Plaintiff to a low security institution with a large population of non-violent offenders.

## IV. THE BALANCE OF EQUITIES AND PUBLIC INTEREST FAVOR DEFENDANTS

"Prison administrators, and not the courts, are to make difficult judgments concerning institutional operations," *Turner*, 482 U.S. at 89, and courts "must accord prison administrators wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security," *Hatim*, 760 F.3d at 59.  As discussed above, the President, as the head of the Executive Branch with ultimate responsibility for the operation of its prisons, has deemed it important to protect the safety, well-being, and privacy of female inmates in intimate spaces when they are in federal custody.  Regardless of the public debate over these issues, there is a public interest in deferring to the Executive Branch's determination as to the operations of the federal prisons, particularly given that the Executive Order is to be implemented in a manner "consistent with applicable law," including the Constitution.  Exec. Order 14168 § 8(b).

## V. ANY INJUNCTIVE RELIEF MUST COMPLY WITH THE PLRA

Although the Court should not issue any injunctive relief for the reasons explained above, if it is inclined to do so, it should adhere to PLRA's restrictions. Under the PLRA, "[p]rospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs."  18 U.S.C. § 3626(a)(1).  As to

preliminary injunctive relief specifically, such relief "must be narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means to correct the harm." *Id.* § 3626(a)(2). The court "shall give substantial weight to any adverse impact on public safety or the operation of the criminal justice system caused by the preliminary relief." *Id.* Moreover, "[p]reliminary injunctive relief shall automatically expire on the date that is 90 days after its entry, unless the court makes the findings required under [18 U.S.C. § 3626(a)(1)] for the entry of prospective relief and makes the order final before the expiration of the 90-day period." *Id.* Any order granting prospective or preliminary relief would need to comply with these provisions of the PLRA.

Specifically, any TRO or preliminary injunction should apply to the named Plaintiff only. A broader nationwide injunction would transgress not only Article III principles, but also the PLRA's specific requirement that relief be "narrowly drawn" and "extend no further than necessary to correct the harm the court finds requires preliminary relief." *Id.* § 3626(a)(2). Consistent with this requirement, the Court correctly limited its preliminary injunction in *Doe* to the named plaintiffs in that case. *See* Prelim. Inj. at 2, No. 25-cv-286, ECF No. 44. The Court thus should reject Plaintiff's request that the Court broadly enjoin Defendants "from enforcing Sections 4(a) and 4(c)" of the Executive Order.

## VI.    RELIEF AGAINST THE PRESIDENT IS IMPROPER

Although Plaintiff has named the President as a Defendant, federal courts have "no jurisdiction of a bill to enjoin the President in the performance of his official duties." *Franklin*, 505 U.S. at 802–03 (quoting *Mississippi v. Johnson*, 71 U.S. 475, 501 (1866)); *see also Newdow v. Roberts*, 603 F.3d 1002, 1013 (D.C. Cir. 2010) ("[C]ourts do not have jurisdiction to enjoin [the President] . . . and have never submitted the President to declaratory relief."). Accordingly, in *Doe 2 v. Trump*, 319 F. Supp. 3d 539 (D.D.C. 2018), the district court dismissed "the President as a party

to this case." 319 F. Supp. 3d 539, 541 (D.D.C. 2018). The Court therefore lacks jurisdiction to enter Plaintiff's requested relief against the President and should dismiss him as a defendant.

## CONCLUSION

The Court should dismiss the case under the PLRA. At a minimum, the Court should deny Plaintiff's motion for a temporary restraining order. If the Court enters a TRO, however, Defendants respectfully request 10 days from the date of that order to file an opposition to Plaintiff's motion for a preliminary injunction.

Dated:  February 22, 2025                        Respectfully submitted,

EDWARD R. MARTIN, JR.
United States Attorney

ERIC HAMILTON
Deputy Assistant Attorney General

JEAN LIN
Special Litigation Counsel

/s/ John Robinson
JOHN ROBINSON (Bar No. 1044072)
ELIZABETH B. LAYENDECKER
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L. Street, NW
Washington D.C. 20005
(202) 616-8489
john.j.robinson@usdoj.gov